214 Cal.App.2d 39 (1963)
Estate of MARTHA J. GAREY, Deceased. BEVERLY DUFFILL MERRILL, Petitioner and Appellant,
v.
THE MOTHER CHURCH, THE FIRST CHURCH OF CHRIST, SCIENTIST, BOSTON, MASSACHUSETTS, et al., Claimants and Respondents.
Civ. No. 26411. 
California Court of Appeals. Second Dist., Div. Two. 
Mar. 14, 1963.
 Mitchell, Silberberg & Knupp and Peery Price for Petitioner and Appellant.
 Lindstrom, Robison & Lovell, Lindstrom, Robison, Lovell & King, Harris Robison, Jack R. Lovell and Arthur W. Eckman for Claimants and Respondents.
 ASHBURN, J.
 In this heirship proceeding petitioner-appellant, Beverly Duffill Merrill, seeks to establish that she is an heir of her paternal grandmother, Martha J. Garey, who died testate in 1960. Petitioner claims to be a pretermitted heir.
 Petitioner's mother divorced her natural father in 1931, and married Gregor Merrill in 1933. The natural father, a son of the decedent, died in 1934. Gregor Merrill adopted petitioner in 1939 when she was 10 years old.
 The only question to be determined is whether petitioner is an heir of decedent and as such entitled to succeed to the natural grandmother's estate. This turns on the proper interpretation of section 257 of the Probate Code which, as amended in 1955, states: "An adopted child shall be deemed a descendant of one who has adopted him, the same as a natural child, for all purposes of succession by, from or through the adopting parent the same as a natural parent. An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by adoption, nor does such natural parent succeed to the estate of such adopted child, nor does such adopted child succeed to the estate of a relative of the natural parent, nor does any relative of the natural parent succeed to the estate of an adopted child." (Italics added.) *41
 From the enactment of the Probate Code in 1931 until section 257 was amended in 1955, the section read as follows:
 "An adopted child succeeds to the estate of one who has adopted him, the same as a natural child; and the person adopting succeeds to the estate of an adopted child, the same as a natural parent. An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by the adoption, nor does such natural parent succeed to the estate of such adopted child."
 Appellant contends that section 257 is ambiguous and that the meaning of the portions which are emphasized above has never been judicially determined; also that the 1955 amendment of the statute did not change the existing law so as to affect the rights of an adopted child to succeed to the estate of a relative of the natural parent when the natural parent died before the adoption of the child.
 The argument is that the statute is only applicable "when the relationship between them [parent and child] has been severed by adoption," but not when the parent died before the adoption. Counsel say that in this case the relationship between the parent and child was severed by the death of the father, not by the adoption, and therefore section 257 does not apply. They also contend that the word "such" (above emphasized in the statute) relates back, and would have that clause read, "nor does such adopted child [when the relationship between the parent and child has been severed by adoption] succeed to the estate of a relative of the natural parent."
 Counsel assert that any other interpretation would in effect make the emphasized words meaningless; that the Legislature could have left out the clause, "when the relationship between them has been severed by adoption," if it did not intend to imply that adoption does not inevitably sever the relationship of parent and child, and if it did the Legislature need only have used the words "an adopted child"--which in fact it did use.
 [1] "It is a cardinal rule of statutory construction that in attempting to ascertain the legislative intention effect should be given, whenever possible, to the statute as a whole and to every word and clause thereof, leaving no part or provision useless or deprived of meaning." (Weber v. County of Santa Barbara, 15 Cal.2d 82, 86 [98 P.2d 492].) The clause "when the relationship between them has been severed by adoption" is important to the meaning of the statute, but not as appellant contends. *42
 [2] The first sentence of the original section uses the word "succeeds," but it was changed by the amendment to constitute the adopted child "a descendant" of the adopting parent and declares this not to be merely for purpose of succeeding to his estate, but "for all purposes of succession by, from or through the adopting parent the same as a natural parent." (Italics added.) Plainly, this 1955 language implies the substitution, for inheritance purposes, of the adopting parent's family for that of the adoptee's clan. But the second sentence of the amendment supplements and clarifies the first. It retains the language of the second sentence of the 1931 text--"when the relationship between them has been severed by adoption"--and adds thereto, "nor does such adopted child succeed to the estate of a relative of the natural parent, nor does any relative of the natural parent succeed to the estate of an adopted child." This latter clause emphasizes the legislative intent to substitute the adoptive family for that of the natural family for inheritance purposes in case of adoption, and the clause relating to the effect of severance of the relationship of parent and child through the act of adoption remains as it was before.
 The reason for this last mentioned provision seems apparent and is suggested by Estate of Mercer, 205 Cal. 506 [271 P. 1067]. The question there presented was whether an adopted daughter or the sister of the widow of an adopting parent was entitled to nominate an administrator of an intestate decedent. This turns, of course, upon the right to inherit. In 1873 W. L. Mercer adopted Hermina Augusta Tappendorf. He died in 1908, bequeathing his estate to his widow, Anna B. Mercer. She died intestate in 1927, leaving an estate which was formerly community property of her husband and herself. She left no issue or parents surviving and her nearest blood kin was a sister, Maria Benson Emery. In a contest over granting of letters the court ruled in favor of the adopted daughter and against the sister. Upon appeal the ruling turned upon the right of the adopted daughter to succeed to said erstwhile community property. The statutes involved were section 228 of the Civil Code and subdivision 8 of section 1386, Civil Code. [fn. 1] At page 510 the court said: "There is nothing in section 228 that in any way contemplates termination of the status of an *43 adopted child when once it is lawfully fixed (Estate of Jobson, 164 Cal. 312 [128 P. 938, 43 L.R.A.N.S. 1062]; Estate of Hunsicker, 65 Cal.App. 114, 118 [223 P. 411]). Neither the death of the adopter nor of the adopted child would have any such effect." [3a] In other words, the interest of the adopted child vests upon the death of the natural parent when that occurs before adoption and any statute which would attempt to divest it as an incident to the subsequent adoption by another would be not only highly inequitable but also subject to serious charge of unconstitutionality.
 Estate of Pillsbury, 175 Cal. 454, 459 [166 P. 11, 3 A.L.R. 1396], states the proposition more clearly: "Thus we come to the fundamental question--the effect upon the rights of the minors of their adoption as children into the family of A. C. Pillsbury. Unquestionably, since this followed the death of their father, it did not affect their status as his heirs. Whatever rights as heirs had descended to them upon the death of their ancestor they still retained."
 [4a] The phrase now under discussion--"when the relationship between them has been severed by adoption"--was placed in the law in 1931 and having been retained when the 1955 amendment was made, that cannot be viewed as an attempt to inject some new principle into the law of adoption.
 Estate of Calhoun, 44 Cal.2d 378 [282 P.2d 880] (April 26, 1955), ruled that property of an intestate adopted child, which he had inherited from his adopting parent, passed to his natural kindred with whom he was unacquainted, to the exclusion of his brother by adoption. The 1955 amendment was adopted on June 30, 1955, approximately two months after the Calhoun decision, and counsel for both sides concede that that case furnished the principal reason for the change in the law, largely because of the dissenting opinion of Mr. Justice Traynor therein. The majority of the court said, in part: "In these cases, all of which were decided prior to 1931, the statutes relating to the right of succession considered in connection with those relating to adoption, had been construed as follows: (1) the adopted child inherits from his adopting parents and they inherit from him; (2) upon adoption he ceases to inherit from his natural parents, and they cease to inherit from him; (3) the adopted child's status with regard to other natural relatives is not changed, and his right to inherit from them is not cut off by the adoption; and (4) by the adoption the child does not gain the right to inherit from collateral relatives of the adopting parents." (P. 384.) "Under present-day conditions *44 it may be the better social policy to substitute the relationship of the adoptive family for that of the blood relatives. With many children placed for adoption by agencies licensed for that purpose, there has developed a demand for secrecy as to the identity of the blood relatives, and in most cases, for all practical purposes, an adopted child is entirely cut off from his natural family relationships."
 "This court may not usurp the legislative function to change the statutory law which has been uniformly construed by a long line of judicial decisions. (See Estate of Stewart, 30 Cal.App.2d 594, 598 [86 P.2d 1071]; note 2 U.C.L.A. Law Rev. 269.) Moreover, any change should be made only after a complete examination of all of the consequences. If adoption is to effect a complete substitution in family relationship, the legal rights of collateral relatives should be fully considered in connection with statutes relating to pretermitted heirs, inheritance taxes and the like." (P. 387.)
 The dissenting opinion: "An adopted child is not given all of the rights of that relationship if he may not also inherit from his adoptive grandparent or through his adoptive parent in any case in which a natural child could do so." (P. 390.) By way of conclusion: "Whatever doubt there may have been with respect to that policy in the past, it is clear today that the objective of adoption is the 'consummation of the closest conceivable counterpart of the relation of parent and child,' in which the child becomes a member 'to all intents and purposes, of the family of the foster parents.' (In re Santos, supra, 185 Cal. 127, 130 [195 P. 1055]; see also Adoption of McDonald, supra, 43 Cal.2d 447, 459 [274 P.2d 860].) Only by treating the adoptive child as a natural child for all purposes of inheritance is that objective obtained." (P. 392.)
 Though not dealing with a comparable fact combination, the later cases of Estate of Stanford, 49 Cal.2d 120 [315 P.2d 681], and Estate of Heard, 49 Cal.2d 514 [319 P.2d 637], throw light upon our present problem, for they carry forward (without the aid of section 257) the doctrine advocated by Mr. Justice Traynor in the passage last quoted above. In Stanford, the question was whether an adopted child would take under a will giving a remainder to "child or children" of testatrix' niece. In Heard, it was whether an adopted child was "lawful issue" of John within the terms of the will. In both cases the question was answered in the affirmative. *45
 The will of Mrs. Stanford left to her niece, Amy L. Hansen, the income from a trust during her lifetime and upon termination thereof at her death the remainder to "belong to and be delivered to the child or children of said Amy L. Hansen." The dissenting opinion in that case (49 Cal.2d at p. 143) succinctly sets forth the cardinal facts: "The will is dated July 28, 1903; Mrs. Stanford died on February 28, 1905. Her niece, Amy L. Hansen, was 37 years of age when the will was made; she had one son, Walter L. Hansen, who was then 13 years old; he died on October 21, 1918, without issue, at the age of 28, leaving all his estate by will to Mrs. Ruth Barton, who was not a relative of Mrs. Stanford but a total stranger to her. His mother, Amy L. Hansen, survived him. Some 19 years after the death of Mrs. Stanford, on February 23, 1924, Mrs. Hansen adopted under the laws of New York her own niece, Aimee G. Reynolds, an adult, and Aimee's two minor children now named Minnie Devereaux Bond Rochester and Aimee Christine Muniz. These children had not been born at the time of Mrs. Stanford's death and she had had no information about any such prospective adoption and no reason to anticipate it as a probable future event." The court had recognized, in Estate of Pierce, 32 Cal.2d 265 [191 P.2d 1], as in a multitude of other cases, that intent of the testator must control in the interpretation of a will, saying in the Pierce case, at pages 268-269: "Even though an adopted child has a status with respect to its adoptive parent identical to that of a child born of such parent and succeeds to the estate of an adoptive parent in the same manner as a child born of such parent, it does not follow that such status is determinative in construing the terms of a will. ... In the determination of the rights of an adopted child under a will, the controlling question is not whether the adopted child would inherit from its adoptive parent under the statute of succession, but whether the adopted child is included among the persons the testator intended to share in his estate." Nevertheless, the court held in Stanford that the adoptees took under Mrs. Stanford's will.
 That opinion contains these significant passages which demonstrate the prevailing philosophy of the Supreme Court, unaided by statute, to be the one which respondent contends to have been written into Probate Code section 257 in 1955. At page 135, the Stanford opinion says: "It has been the policy of this state, at least since the adoption of the Civil Code, to accord to adopted children the same status as natural *46 children." Quoting from 43 Michigan Law Review, at page 138: "The status of an adopted child should be of some significance in construing a will for the testator may be said to realize the possibility of adoption and its effect. It has been well said: '... by investing an adoptee with a particular status, such as that of a "child" of the adopter, the statute may have the inclusionary effect of tending to bring the adoptee within a designation. Thus, if the statute declares that the adoptee shall be deemed a "child" of the adopting parents as fully as though born to them in lawful wedlock, it is properly one of the circumstances in the light of which a devise to the "children" of the adopting parents should be read. Where it is the sole surrounding circumstance of any materiality, the argument may be advanced that it supplies the conveyor's meaning. ...' " And at page 139: " 'Other adoption statutes, however, in growing number, do not restrict the status of the adoptee to that of an heir of the adopter or to that of a child for purposes of enumerated benefits only. The trend is toward making the adopted child a child of the adopter to all intents and purposes.' "
 In Heard, supra, at page 519: "We have pointed out in Estate of Stanford, ante, p. 120 [49 Cal.2d] [315 P.2d 681], the policy in this state to give to an adopted child the same status as a biological one. ..." Passing reference is made on said page to the 1955 amendment "which broadens scope of inheritance by adopted child." Quoting another law review article, the opinion says, at page 519: " 'If the genetic connection is what is meant, then it must be noted that the act of transmission is accomplished in a comparatively short time and does not necessarily involve any after-contact or relationship. Is this "natural relation" more natural or more important than the mutual, reciprocal and continuous relation between parent and child, which may occur in adoptive or non-adoptive families, involved in the rearing of a child from infancy to maturity with all of the impact of day-to-day care and upbringing upon character, psychology, outlook, emotional make-up, and even biology which that entails? In this sense, does not nature "do the work of nature" and create one a child who by nature is a stranger? In fact, in this sense, does not nature do the work of nature and create one a child who by nature is not a stranger? ..."
 " 'The over-all purpose of these sections, taken together with Civil Code, section 221, evidently was to create a new legal relationship of parent and child which normally would be coupled with the natural relation of parent and child *47 springing from the fact that that is the relationship in which they actually live; and to make the new legal relationship legally the same as the old legal relationship of parent and child which normally is coupled both with the genetic and the factual natural relation of parent and child. ...' "
 At page 521: "On the family experience and contact theory, the relatives of the adoptive parents, lineal and collateral, become the relatives of the adopted child. Normally, they are the only grandparents, uncles, aunts, brothers, sisters and cousins he knows. His genetic grandparents, uncles, aunts, brothers, sisters and other relatives in a sizable percentage of cases of illegitimate birth will not even have been aware of his existence; and in many other instances will have known him only very briefly prior to his surrender for adoption as a very young infant."
 [5] These theories were written into the law through the 1955 amendment. In a case note found in 29 So. Cal. L. Rev. 126, it is said: "Thus any future effect of the Calhoun case has been overcome, and California now adheres to the view that an adoption, for succession purposes, creates a complete substitution of the adoptive family for that of the natural family."
 "While the right of succession is entirely statutory, Probate Code section 257 is the only California code section expressly dealing with the effect an adoption has upon succession. Prior to the recent amendment, it provided only for the substitution of the adoptive parents for the natural parents. No express legislative directive existed determining the effect an adoption would have upon the succession rights of collateral or lineal relatives. The case law relating to an adopted child's right to succeed from and be succeeded by collateral and lineal relatives stemmed from In re Darling [173 Cal. 221 (159 P. 606)], where it was held that an adopted child would succeed to the estate of his natural grandparent. From cases following the rationale of the Darling case, the rule became established that an adopted child inherited from, but not through, his adoptive parents."
 At page 127: "That a remedy exists if there are infirmities in the intestate succession scheme is clearly evidenced by the instant course of events, where in little more than two months after the Calhoun decision, Probate Code section 257 was amended."
 "It appears that there were several considerations which motivated the amendment, apart from the result reached in *48 the Calhoun case. First, Justice Traynor's dissent to that decision was undoubtedly influential. Justice Traynor's primary contention was that the 'objective of adoption is the "consummation of the closest conceivable counterpart of the relationship of parent and child." ' He reasoned that to deny adopted children the right to succeed and be succeeded by collateral relatives in effect impaired the realization of that relationship. Second, one of the principal objectives of an intestate succession scheme should be to effectuate a distribution most apt to parallel that which the average reasonable individual would have directed had he died testate. In California, almost 80 per cent of adopted children are adopted before the age of one, and, as a result, it is likely that in most cases they would look upon their adoptive families, collaterals included, as their only kindred. While it is clear that no fixed system of succession would in every case coincide with the distribution a particular individual would have directed had he died testate, it seems likely that in amending section 257 and providing for a complete substitution, the legislature created that system of distribution which is most likely to coincide with the intent of adopted children and is most consistent with the objective of having an adoption simulate the natural relationship as closely as possible."
 And at page 128: "First, the result reached by the application of a technical approach would appear to be contrary to the spirit of the amendment to section 257 which, by its unequivocal language, clearly contemplates a complete substitution for all purposes. Second, to deny the adopted child the right to qualify as the pretermitted heir of his adoptive grandparent would be to deny him entirely the right to qualify as the pretermitted heir of either his natural or adoptive grandparent, for it would seem that an adopted child can no longer benefit as a pretermitted heir of his natural grandparent; if pretermitted, he could only succeed to the amount he would have received had the decedent died intestate, and section 257 now denies him the right to succeed to any portion of his natural grandparent's estate."
 In a discussion of the said amendment which is found in 7 Hastings L. J. 86, under the caption The Rights of an Adopted Child to Inherit under the California Probate Code, it is observed at page 89 that the phrase " 'when the relationship between them has been severed by adoption ...' has been carried down by the Legislature from the date of passage of the first adoption law in 1869 and has been uniformly construed in all cases litigating the matter. *49 "
 "Section 257, as amended, does not, however, limit itself to severing the relationship between parent and child, but by this amendment would seem to go much further than has any previous statute and severs all ties between the adopted child and relatives of the natural parent. This portion of the section states: '[N]or does such adopted child succeed to the estate of a relative of the natural parent, nor does any relative of the natural parent succeed to the estate of the adopted child.' (Emphasis added.) The intent of the Legislature here seems, for the most part, clear, leaving only the definition of the term 'relative' to judicial construction. Black's Law Dictionary defines relative as: 'A kinsman; a person connected with another by blood or affinity.' If this definition is applied, the adopted child is deprived of all rights of inheritance which he previously had from his natural grandparents, his natural brothers and sisters and all other relatives of his natural parents. This portion of the statute clearly changes the rights of the parties from that which existed prior to this amendment and further manifests the displeasure of the Legislature with the result of In re Calhoun, which it summarily overrules, at least in principle."
 At page 90: "The code section then grants to the adopted child the right to succeed '... from or through the adopting parent.' The adopted child has by this portion of the statute been given but one new right which he did not have under the previous statutes regulating this matter. By permitting the adopted child to take 'through the adopting parent,' the Legislature has permitted him to take from the adopting parents' ancestors and collateral relatives by right of representation."
 It clearly appears, we think, that the purpose of the amendment was to enlarge the right of inheritance by an adopted person and to do so through recognition of the Traynor theory expressed in Estate of Calhoun, supra.
 [4b] As the phrase "when the relationship between them has been severed by the adoption" had been in the statute since 1931, the 1955 amendment had no effect upon it and the question discussed by counsel herein does not arise from the amendment but goes back to the 1931 enactment. No decisions have been rendered since that date that sustain appellant's position. The logic of the situation is against it.
 [3b] If death severs the relationship of father and child, it instantaneously vests in the child a right to succeed to the *50 property of an intestate parent and no subsequent adoption could affect that vested right. (Estate of Pillsbury, supra, 175 Cal. 454, 459.) During the period between the father's death and the subsequent adoption of his child do they not remain parent and child though one of them be deceased? There is a blood relationship which cannot be severed, try though the Legislature may. Mr. Justice Shinn, speaking for the court, in Estate of Esposito, 57 Cal.App.2d 859, 864 [135 P.2d 167], drew the appropriate distinctions. "Gloria's adoption by strangers severed her legal relationship toward her natural parents and established a new one with the foster parents, but her status as a relative by blood of the kindred of her parents was not altered." (P. 864.) Quoting from In re Darling, 173 Cal. 221, 225 [159 P. 606]: " '... The adoption simply fixes the status of the child as to its former and adopted parents. To its grandparents by blood it continues to be a grandchild, and the child of its parents by blood. It does not acquire new grandparents in the persons of the father and mother of an adopting parent.' ... 'But his relationship to his grandparents by blood on either side is not affected by the adoption. As to them he is, notwithstanding the adoption, the "issue" or child of their child within the meaning of section 1386 of the Civil Code.' ... But it does not follow, because of these privileges conferred by statute upon adopted children as incidents of adoption, that they have ceased to be lineal descendants of their natural parents within the purview of section 92, Probate Code. It has never been held, so far as we are advised, that adoption does more than substitute foster parents for natural parents, without affecting the relationship of the child toward its relatives by blood and without creating new relationships with the kindred of the foster parents." (Pp. 864-865.) "One relationship is natural, the other purely artificial or statutory. The first is not lost because the other is gained, unless the statute so provides (In re Darling, supra), and there is no such provision. The statutory law, as we have seen, gives the adopted child new rights of inheritance, although not by right of representation, and takes away its right to inherit from the natural parents but not the right to inherit through them. There is no basis in law or reason for saying that the child is not the lineal descendant of its deceased natural father for the purpose of taking a legacy under section 92, Probate Code." (P. 866.) Though characterized as dictum, the major portion of the foregoing quotation from page 866 of Esposito was *51 quoted with apparent approval in the majority opinion in Estate of Calhoun, supra, at page 386.
 [6] When the phrase--"the relationship between them has been severed by the adoption"--was placed in the statute in 1931 it doubtless was used by the Legislature with a recognition of the flexible character of the word "relationship" and in the sense of inheritance status. If severed by death the right of inheritance remains, says the statute impliedly, but if severed by adoption it ceases.
 The theory advanced by appellant at bar was definitely rejected in Estate of Serventi, 190 Cal.App.2d 514 [12 Cal.Rptr. 206]. That short opinion reads: "In this heirship proceeding petitioner-appellant seeks to establish that he is an heir of John Serventi, who died intestate in 1959."
 [7] "Petitioner's natural father, a brother of decedent, died in 1941. The widow, mother of petitioner, married Archangelo Menghini in 1945. In 1947 Menghini adopted petitioner as his son. The trial court held that because of this adoption, petitioner is not an heir of the decedent, under the law of descent and succession as amended in 1955. That ruling is correct and must be affirmed."
 "Petitioner correctly claims that he is an heir of his natural father, the father having died prior to the adoption. As such 'descendant,' petitioner claims the right under section 228 of the Probate Code to inherit from the uncle 'by right of representation.' However that might have been if the uncle had died prior to the 1955 amendment of section 257 of the Probate Code, it is not true when, as in this case, the uncle died after the date of that amendment. As thus amended, section 257 expressly declares that an adopted child shall be deemed a 'descendant' of one who has adopted him, 'for all purposes of succession by, from or through the adopting parent,' and that the adopted child does not 'succeed to the estate of a relative of the natural parent.' (Stats. 1955, ch. 1478, p. 2690.) This holding is in harmony with the views expressed and rulings made in Estate of Dolan, 169 Cal.App.2d 628 [337 P.2d 498], and Estate of Dillehunt, 175 Cal.App.2d 464 [346 P.2d 245]. The judgment is affirmed."
 The briefs in that case do not bear out appellant's claim at bar that "the court in Serventi did not consider or decide the point here raised," and "it did not decide or purport to decide the meaning of words in the statute that were not called to its attention, and which it overlooked in writing its *52 opinion." Pertinent arguments of appellant's opening brief in that case are set forth in the footnote. [fn. 2]
 Estate of Dolan, 169 Cal.App.2d 628 [337 P.2d 498], does not involve the question of the effect of death of the parent before adoption of his child, but Mr. Justice Peek therein makes a clear explanation of the amendment as follows: "Prior to 1955, section 257 of the Probate Code provided for reciprocal succession between the adopted child and his adoptive parents and eliminated any such right as between the child and his natural parents. By the 1955 amendment to said section, an adoptive child was deemed a descendent of the adoptive parents for all purposes. The section retained the same restrictive provision as between the adoptive child and the natural parents and added the provision '... nor does such adopted child succeed to the estate of a relative of the natural parent, nor does any relative of the natural parent succeed to the estate of an adopted child.' The intent of *53 the 1955 amendment would appear quite obvious. It corrected the inequities so well illustrated in Estate of Calhoun, 44 Cal.2d 378 [282 P.2d 880], and placed the adoptive child upon a completely equal footing with a natural child of the adoptive parents insofar as rights of succession are concerned. And by the same token it completely removed the adopted child from his natural family so that he would no longer succeed to the estate of any of his collateral relatives, nor could they succeed to his estate." (P. 629.)
 Estate of Dillehunt, 175 Cal.App.2d 464 [346 P.2d 245], did not involve adoption after death of the natural parent. Petitioner claimed as a pretermitted grandson of decedent who died in 1957. The court necessarily considered the effect of the 1955 amendment, saying at page 467: "It seems clear, therefore, and is conceded by the parties hereto, that by the amendment of the section it was the intention of the Legislature to provide that the adopted child had rights of inheritance in the estate of his adoptive parents only, he being granted all of the rights of a natural child with reference thereto, but that by the adoption, his rights of inheritance from or through his natural parents were severed and terminated. There seems to be no room for any other construction in the light of the express language used."
 The preponderance of authority and of logic is against appellant's contentions herein.
 The decree determining heirship is affirmed.
 Fox, P. J., and Herndon, J., concurred.
 "The Pillsbury case has never been overruled or criticized by any Appellate Court in this state or for that matter in any other state, as far as we can discover. The codification of the Probate Code in 1931 did not affect the law stated in the Pillsbury case, since the codification of the law in 1931 was a restatement of the then existing law by the California Probate Code Commissioners."
 After quoting section 257, as amended in 1955, the brief also says: "This is a restatement of the Code as it existed at the time of the Pillsbury case with the addition that 'nor does such adopted child succeed to the estate of a relative of a natural parent, nor does any relative of a natural parent succeed to the estate of an adopted child.'"
 "This addition was obviously meant to complete the separation of an adopted child from his other natural relatives. An adopted child, even before the 1955 amendment, according to Probate Code Section 257, could not inherit from his natural parent. However, even before 1955, if the adoption took place after the death of a natural parent, then the child could inherit from his natural parent. As relates to the parent the 1955 amendment to the Probate Code adds nothing. If the Probate Code Section 257 and prior case law did not stop the inheritance by an adopted child from a natural parent if the adoption had taken place after the death of the natural parent, then the 1955 amendment to Probate Code Section 257 does not prevent an adopted child from standing in the shoes of his natural parent and inheriting from natural collateral relatives as long as the adoption of the child took place after the death of the natural parent."
NOTES
[fn. 1] 1. Section 228 provided: "A child, when adopted, may take the family name of the person adopting. After adoption, the two shall sustain toward each other the legal relation of parent and child, and have all the rights and be subject to all the duties of that relation."
[fn. 2] 2. The California case of Estate of Pillsbury (1917), 175 Cal. 454 [166 P. 11, 3 A.L.R. 1396] specifically states that children have a right to inherit from their natural father even though they have been adopted by a step-father, as long as the adoption took place after, and not before death of their natural father. The Court stated: 'Thus we come to the fundamental question, the effect upon the rights of the minors of their adoption into the family of A. C. Pillsbury. Unquestionably since this followed the death of their father, it did not affect their status as his heirs, whatever rights as heirs had descended to them upon the death of their ancestor they still retained ... their rights as heirs of the deceased, which rights, as we have said, stand unaffected.'