[Civ. No. 20820.  First Dist., Div. Three.  Dec. 4, 1963.]

Estate of LOUISE AMELIA GOULART, Deceased. ROSA A. XAVIER et al., Plaintiffs and Appellants, v. LOUIS S. AMARAL et al., Defendants and Respondents.

LeRoy A. Broun and Robert L. Lancefield for Plaintiffs and Appellants.

Sabraw & Avera and Fred E. Avera for Defendants and Respondents.

DEVINE, J.—There are two appeals: one, from a judgment for proponents in a will contest tried to a jury; and the

other, from a judgment determining interests in the estate under the will.

Decedent, Louise Goulart, was born in the Azores in 1878. In the early part of the present century, she came to California to make her home with Jose P. and Louise Amaral. This couple, being childless, wished to adopt her, but could not do so under the law at that time because she was an adult. She lived with the two until the death of the aunt in 1935. In 1952, the law having been changed to allow the adoption of an adult, Jose P. Amaral adopted Louise Goulart. She was then 74 years old. She did not, however, change her name. He declared that she had been as a daughter to him and that he could repay her for services to him only by giving her security and leaving her his estate. She kept house for him. He died in 1953 and devised his estate to her.

The challenged will of Louise Goulart is dated September 18, 1957. She died on January 24, 1960. She had never married. The will leaves her whole estate (except small bequests for Masses), which she had received from her adoptive parent, of value about $250,000, to a natural brother and two sisters in the Azores, each to receive one third. All three were living when the will was executed, but the brother and one sister died before testatrix died. There are no alternative devises, and there is no residuary clause in the will.

I. THE WILL CONTEST

The sole issue is mental competency of testatrix on September 18, 1957.

The will was prepared by Harold Hove, an attorney who had met the testatrix on one occasion, when he represented taxpayers in a suit in which Louis Amaral was interested, before the first conversation relating to the will. He was selected by Louis Amaral, at the request of decedent. Louis Amaral was not related to the adoptive parent but was a family friend and had taken care of, or assisted in the care of, many affairs of the testatrix since the death of her adoptive father. She could understand many English words, but it appears from the entire testimony of the case that she was quite limited in her use of this language and that most of her conversation was in her native Portugese. She could not read or write, and her correspondence, some of which was with her relatives in the Azores, was carried on through the services of Manuel G. Serpa, whose testimony is summarized below.

Louise Goulart had told Louis Amaral that she did not

wish the services of the attorney who had handled the adoption, in the drafting of her will. She did not tell Mr. Hove about the adoption. She told him that her brother and sisters in the Azores were her only relatives. There is testimony by neighbors that she never spoke of having acquired new relatives by the adoption. Mr. Hove testified that testatrix told him she wanted to leave all of her estate in equal parts to her two sisters and her brother in the Azores. Mr. Hove felt that testatrix could understand what he was saying in English, because she would sometimes reply in English, but he asked Mr. Amaral to translate each paragraph of the draft to her; and Mr. Amaral testified that he did this in simple Portuguese words. Mr. Hove and Mr. Amaral, who was a subscribing witness, testified that in their opinion she was mentally sound on September 18, 1957. The signature is by mark.

Mr. Hove did not ask the testatrix about her property, except to inquire if there were any personal articles which she wished to leave specifically, and she said no. Following the execution of her will, however, testatrix walked to the front door with Mr. Hove and said, ''There is some of my property across the street,'' which was the fact. The principal testimony for appellants is that of the testatrix' personal physician, Dr. Guy Romito. He testified that he had been her physician since 1954 and that although she had periodic episodes of extreme nervousness, she seemed perfectly stable mentally up to May 9, 1957. On that date she was extremely nervous and thought there was a religious cult near her home, which was annoying her. On May 31, 1957, she was somewhat improved, and on June 28 her condition was about the same. The doctor saw his patient on one occasion, which he said was probably between August and October 1957, when she imagined there were people in her backyard and stomping on her roof at night, and she was hearing voices around her. As to the episode of imagining people on the roof, however, there is some uncertainty as to date because the witness who summoned the doctor on that occasion testified that it was shortly before Miss Goulart's entry to Livermore Sanitarium, which was in March 1958. The doctor testified that Miss Goulart had a phobia of cancer, and that he was unable to reassure her successfully, but he said that he had operated on her a few months earlier for a benign tumor, and that many people do not respond to reassurances but she required more than usual. He said that his diagnosis was cerebral arteriosclerosis, the result of which is senile demen-

tia, that this was a progressive condition, and that it was progressive during the period from May to September 1957. He testified, however, that a patient with senile dementia may have lucid intervals which may occur over a period of an hour or two, and possibly, though improbably, for longer than that. The doctor gave his opinion that from May 1957 until her death, his patient was not aware of any matters pertaining to her estate and was not capable of knowing what she would have said in any will.

In March 1958, Dr. Romito suggested that his patient go to Livermore Sanitarium because she was having hallucinations. She did go, and remained about seven weeks. Dr. Maud Lee Etheredge, a psychiatrist at the sanitarium, testified that she had diagnosed the patient's condition as that of schizophrenia, paranoid type. Miss Goulart described her persecutors as a religious group which would run around her house and scream, and enter her room. The doctor thought the patient's living alone had aggravated the condition, and testified that she recovered quickly in the sanitarium. She said she found no evidence of senile dementia and that although older people all have a certain amount of arteriosclerosis, she found no outstanding amount in this case. The patient was well oriented, and the doctor thought she had the capacity to understand her relationship to her relatives. In a case of senile dementia, the doctor testified, the memory is very poor and she did not find this to be the case with Miss Goulart.

Frank Madruga, retired Fire Chief of the City of Fremont, testified that in the middle of 1957 there was a proposition made to Miss Goulart for the sale by her of certain property for $115,000, but she objected because she thought the property was worth more. Maria Vargas, testatrix' grandniece, who came to this country from the Azores in 1959 and visited testatrix on one occasion about the middle of that year, testified that the testatrix spoke about the family in the Azores and told how she had left her property by the will. At the time of the visit, Miss Goulart knew that one of her sisters, Miss Vargas' grandmother, was dead. She had died May 4, 1958.

A summary of the testimony of other witnesses produced by respondents appears below under discussion of the subject of "Opinions of Lay Witnesses Relating to Competency."

Contestants called in rebuttal Mr. Craig, manager of a rest home in which testatrix lived from September 27, 1958, until three days before her death. He testified that she was con-

fused, frightened, withdrawn from the society of others in the home, and troubled by noises continually. He knew nothing of her condition before her admittance to the home, which was almost exactly a year after the execution of the will.

Contestants are heirs at law of Jose P. Amaral, and of Louise Goulart by virtue of the adoption. Contestants made no attempt to show any intimacy whatever between testatrix and themselves. One of them, indeed, had been an unsuccessful contestant of the will by which Jose P. Amaral left his property to his adopted daughter.

## A. *Instructions Relating to Mental Capacity*

■ Appellants contend that they were entitled to their proffered instruction that if the jury should find that at any time prior to the execution of the instrument, the purported testatrix lacked testamentary competency which was caused by a mental disorder of a general and continuous nature, a presumption arose that said incompetency continues to exist. The court refused this instruction, but did instruct that when such mental disorder of a general and continuous nature is shown, an inference may arise that incompetency continues to exist and that it is for the jury to determine whether or not the inference is reasonable. Appellants cite the statement in *Estate of Fosselman*, 48 Cal.2d 179, 186 [308 P.2d 336], that where mental disorder of general and continuous nature exists the inference is reasonable, and "perhaps there is even a legal presumption," that the incompetency continues to exist. It will be seen at once that the Supreme Court did not decide that there is, but only suggested that there may be, such a presumption. The *Fosselman* case was one in which the finding of incompetency by the trial judge was affirmed. The decedent was disoriented and was laboring under delusions which directly affected the testamentary act. Directly following the statement just given, the court referred to the progressive character of senile dementia and to its effect in its advanced stages. Nothing appears in that case about lucid intervals, but in the case before us the doctor testified that a patient (and although he did not specifically mention this patient, he must have had her case in mind) may have lucid intervals. Whether it would ever be proper to instruct on a presumption of continuing incompetency, we need not decide; in the case before us, it was proper to hold the contestants to the usual burden of proving incompetency at the time of the execution of the will (*Estate of Darilek*,

151 Cal.App.2d 322, 327 [311 P.2d 615]), without giving the jury any instruction setting up a presumption such as that contended for by appellants.

■ Appellants find fault with the giving of an instruction that the testimony of the attorney who prepared the will, that his client was mentally sound at the time, must be given serious consideration in weighing conflicting evidence, especially where he is also a subscribing witness. Although statements to this effect run through some of the cases (*Estate of Hansen,* 38 Cal.App.2d 99, 115 [100 P.2d 776]; *Estate of Pessagno,* 58 Cal.App.2d 390, 402 [136 P.2d 644]), we have doubt as to the propriety of giving such a statement as an instruction to the jury, particularly in a case where the attorney had but little earlier contact with the testatrix, and where his contact with her in the drafting and execution of the will had to be accomplished through an interpreter. The jury was instructed, however, that it was their duty alone to decide all questions of fact, that the credit to be given any witness was to be determined by them, and that they should understand that the court in no manner intended to express an opinion as to any issue in the case or as to the truth or falsity of the testimony of any witness. When these admonitions are considered together with all of the evidence in the case, we find no prejudicial error, if any error at all, in the giving of this instruction.

### B. *The Subject of Contestants' Status as Heirs*

■ In two respects, appellants complain of rulings of the court concerning, in general, their relationship to decedent. First, they asked the court to instruct the jury that they are heirs at law of decedent, and that since the adoption, decedent would no longer succeed to the estate of any of her natural relatives, nor would they succeed to her estate, and that under certain circumstances she might succeed to their estates. The court did instruct that contestants are heirs at law of decedent, are therefore persons interested in her estate and are given the right by the Probate Code to contest her will. This was adequate. The court need not have given all the legal consequences of the adoption. There seems to have been no reason why appellants' counsel could not have argued the whole matter to the jury, to counteract the impression which he fears they had, that appellants were interlopers. Anyway, what they had to decide was not their personal preference, but the question directly put to them, that of testatrix' mental capacity.

■ .Appellants also contend that the form of special verdict should not have been merely the question which was put, whether the instrument of September 18, 1957, was executed by her when she was not of sound and disposing mind, and not competent to make a will; but should have contained also specific findings as to decedent's capacity (1) to understand the nature and effect of her act, (2) to understand and recollect the nature and situation of her property, and (3) to remember and understand her relatives to be those persons who were her heirs at law. Appellants emphasize No. 3 because, they say, their main contention is that the testatrix had absolutely no conception of her relationship to her adoptive family.

It has been held that the form of special verdict which was given is correct. (*Estate of Little*, 23 Cal.App.2d 40 [72 P.2d 213].) The court instructed the jury on the three elements of testamentary capacity. Appellants' counsel was free to argue them, and no doubt did so. Moreover, the third element, stressed by appellants, is not actual knowledge of the law of inheritance by testatrix, but capacity to understand. Actually, she may not have known, and probably did not know, the change which was made in the law of adoption in 1955, three years after her own adoption; but it is not required that she should have known. If precise knowledge of the laws of succession were necessary for testamentary capacity, only judges and lawyers could be testators, and they, not always.

C. *Opinions of Lay Witnesses Relating to Competency*

Appellants contend that the court erred in the admission of evidence and in instructing the jury in the matter of opinions of lay witnesses respecting soundness of mind of testatrix.

1. *Admissibility of the evidence*

Witnesses (other than Dr. Romito, who testified as an expert witness, and Mr. Hove and Mr. Amaral, who testified as subscribing witnesses) expressed their opinion, in one form or another, as to the mental capacity or soundness of testatrix. Appellants' objections are that they were not intimate acquaintances and that, even if they were, some of the questions and answers invaded the province of the jury.

Mrs. Bettencourt, a nurse, who lived next to testatrix, who saw her every day and who did all her shopping for her, testified, without objection, that she was mentally fine, and went to the Livermore Sanitarium just for nervousness. Mrs. Bettencourt brought her there. She was fine on her return.

Testatrix told her she had made her will and was happy about it. No objection having been made, this testimony is valid, as we think it would have been anyway.

Mr. Serpa, an acquaintance since 1945, also testified, without objection, that testatrix was always of sound mind when he was alone with her, that she knew she had property and its value, that she had the will read to her, in his presence, by Louis Amaral about two weeks after it was executed, and that he wrote a letter for her to one or more of the legatees in the Azoi es that she had left her property to them equally. He testified that in August 1957, he and Mr. Amaral were witnesses to a lease of her property, and that she was well satisfied with it; that she liked to make her own decisions.

█ Mrs. Smith, a neighbor who lived next door to testatrix for about 30 years and who understood the Portuguese language, and who had spoken with testatrix almost every day, gave as her opinion that testatrix was of sound mind. There had been objection, which was overruled on the ground that the witness was an intimate acquaintance. She was then asked if testatrix had mental capacity to understand the nature of making a will. This was objected to as beyond the scope allowed a lay witness, but the objection was overruled. The question was answered affirmatively. Under cross-examination, the witness said she considered herself a good acquaintance, but not an intimate acquaintance, of testatrix.

The fact that the witness stated that she was not an intimate acquaintance is not controlling, because that question is for the judge, and not for the witness, to decide. (*People* v. *McCarthy*, 115 Cal. 255, 259 [46 P. 1073].) █ We have no doubt that the court was correct in ruling that one who had almost daily conversations with testatrix for about 30 years is an intimate acquaintance. █ Appellants are correct, however, in their contention that the opinion should have been limited to testatrix' mental soundness and should not have been permitted to go so far as to state testatrix' capacity to make a will. (*Estate of Rich*, 79 Cal.App.2d 22, 26 [179 P.2d 373]; *Estate of Perkins*, 195 Cal. 699, 710 [235 P. 45].) We believe, however, as the court did in *Estate of Rich*, that the error was not prejudicial in the light of the whole case and, more particularly, because by his cross-examination counsel for appellants brought out the limits of the witness' knowledge of testatrix' affairs, following which no motion to strike the witness' opinion was made.

Mrs. Clark, neighbor of testatrix on the other side from

that of Mrs. Smith, knew her for 40 years, conversed with her two or three times a week, and noticed no mental irregularities. She testified, without objection, that testatrix was mentally competent in September 1957, and again without objection (counsel had requested that objection run to a line of questioning but had not received a ruling allowing this), that she was competent to understand and appreciate her relation to her relatives, and to understand and appreciate the nature and extent of her property with respect to making a disposition of it.

Contestants do not deny that Mr. Hove, as a subscribing witness, was entitled to give his opinion as to the sanity of the testatrix. (Code Civ. Proc., § 1870, subd. 10.) They contend, however, that the witness should not have been permitted to testify, over objection, that the testatrix had mental capacity to understand the nature of her testamentary act and to remember the nature and situation of her property. Here, again, it seems that the witness was allowed to go beyond the statutory limit and to answer a question which was the ultimate one for the jury to decide; but here, too, we believe the error was not prejudicial, upon examination of the whole case.

### 2. *Instructions to the jury*

Contestants complain that the court refused to instruct the jury that they are not to consider an opinion by a lay witness as to the mental competency of testatrix unless they first determine that such lay witness was in fact an intimate acquaintance of the deceased. The court instructed, instead, that the jury is to consider the degree of intimacy in determining how much weight is to be given to the opinion of each witness, from the facts and circumstances upon which the witness founded his opinion. We believe the instructions were correct. The determination of the admissibility of the opinion evidence was for the court, not for the jury. The assessing of the weight was for the jury.

### D. *Nature of the Will*

The dispositive provisions of the will are extremely simple. Despite what is said in the matter of the second appeal, below, about the legal effect of the death of two of the devisees before that of testatrix, the will is a natural one. The devisees are the natural brother and sisters of testatrix. So far as appears, they had never met the interpreter, Louis Amaral, and they were unknown to the attorney who drafted

the will. The will itself bears mute evidence of testatrix' competency. (*Estate of Jamison*, 41 Cal.2d 1, 13 [256 P.2d 984]; *Estate of Woehr*, 166 Cal.App.2d 4, 17 [332 P.2d 818].)

II. ADOPTION AND THE ANTILAPSE STATUTE

The second appeal presents a clear but completely unsettled problem of law, that is, does the antilapse statute, section 92 of the Probate Code, prevent the failure of the devises to the predeceased natural (or biological) brother and sister of testatrix? This statute declares that devises and legacies to predeceased devisees or legatees fail unless an intention to substitute another appears, except that when an estate is devised or bequeathed to kindred of the testator and the predeceased devisee or legatee left lineal descendants, these descendants take in the same manner as the devisee would have done. The predeceased natural brother and sister did leave lineal descendants who, with the surviving natural sister, are respondents. No intention to substitute appears in the will. The problem is to be solved by determining if the natural brother and sister remained "kindred" of testatrix after her adoption. If they did not, there being no disposition of the residue, the testatrix must be deemed to have died intestate as to that portion of the estate. (*Estate of Friedman*, 198 Cal.App.2d 434, 437 [18 Cal.Rptr. 252]; *Estate of Dunn*, 120 Cal.App.2d 294, 295 [260 P.2d 964].) It is undisputed that appellants are the heirs, under the law of succession, and would inherit two thirds of the estate.

Section 257 of the Probate Code, as it is now and has been since 1955, and therefore was at the time Miss Goulart's will was executed and at the time of her death, reads: "An adopted child shall be deemed a descendant of one who has adopted him, the same as a natural child, for all purposes of succession by, from or through the adopting parent the same as a natural parent. An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by adoption, nor does such natural parent succeed to the estate of such adopted child, nor does such adopted child succeed to the estate of a relative of the natural parent, nor does any relative of the natural parent succeed to the estate of an adopted child."

It is contended by respondents that this section, by its terms, applies "for all purposes of succession," and the antilapse statute is not concerned with succession, but with the

820

Legislature's acceptance of the presumed intention of a testator to favor his kindred and their lineal descendants over residuary devisees, if there are any, and over heirs according to statutes of succession, and that "kindred" are blood relatives only.

We believe that the amendment to section 257 was intended to accomplish a complete severance of the former relationship of the adoptee with his natural, or biological, relatives, and to make them no longer "kindred" in the eyes of the law, and on the other hand, to create a new kinship. The word "kindred" is not defined in the Probate Code. Although no amendment to section 92 has been made, it appears that the Legislature intended to create new kindred for the adoptee. We believe that this conclusion follows from (1) the new policy of the state in respect of adoptions, as shown by the history of the 1955 amendment to section 257 of the Probate Code, (2) the trend of judicial decisions, and (3) the logical consequence of construing the word "kindred" as applying exclusively to the new, or adoptive, familial relationship.

1.   History of the 1955 amendment: On April 26, 1955, the decision in *Estate of Calhoun*, 44 Cal.2d 378 [282 P.2d 880], was filed. By it, the Supreme Court held that an adopted child did not become the brother of the natural child of his adoptive parents. The majority opinion recognized that it might be better social policy to substitute the relationship of the adoptive family for that of the blood relatives (p. 387), but held that if the change were to be made, this must be done by the Legislature. Mr. Justice Traynor, in a dissent, expressed the opinion that the objective of adoption is the consummation of the closest conceivable counterpart of the relation of parent and child, in which the child becomes a member, to all intents and purposes, of the family of the adoptive parents (p. 392).   The Legislature promptly responded to the implied invitation of the majority opinion and to the views expressed in the dissent, and enacted the amendment, effective September 7, 1955, making the child a descendant of the adoptive parents, and creating new lines of succession.[1]   At a later point in this opinion, we shall show

| [1]*Section 257 before Sept. 7, 1955* | *Section 257 after Sept. 7, 1955* |
| --- | --- |
| "An adopted child succeeds to the estate of one who has adopted him, the same as a natural child; | "An adopted child *shall be deemed a descendant* of one who has adopted him, the same as a natural child, |

the considerations of logic which we believe show that the change in the line of succession was intended to change the meaning of "kindred," but it is useful initially to recall the origins of the amendment.

2. The trend of judicial decisions has been uniformly towards recognition of a completely new familial relationship by adoption. In *Estate of Dolan,* 169 Cal.App.2d 628 [337 P.2d 498], it was held that a natural sister of the predeceased spouse of the more lately deceased Lulu E. Dolan was not entitled to share under section 228 of the Probate Code in the community property which the spouses had acquired, because the predeceased husband had been adopted; and although under the terms of section 228, brothers and sisters of the predeceased spouse would have taken, and although section 228 had not been amended, the 1955 amendment to section 257 removed the natural "sister" from the category of "brothers and sisters." This ruling was followed in *Estate of Serventi,* 190 Cal.App.2d 514 [12 Cal.Rptr. 206]. In *Estate of Dillehunt,* 175 Cal.App.2d 464 [346 P.2d 245], it was held that, under the amendment, a man who had been adopted was not a pretermitted heir of his natural grandmother, his natural father having predeceased her.

In *Estate of Garey,* 214 Cal.App.2d 39 [29 Cal.Rptr. 98], it was held that a child adopted by a foster parent subsequent to the death of her natural father was, nonetheless, one whose relationship was severed by adoption, rather than by death of the natural parent, and, therefore, was not an heir of the mother of her deceased father. (The trend is observ-

| | |
|---|---|
| and the person adopting succeeds to the estate of an adopted child, the same as a natural parent. | *for all purposes of succession by, from or through the adopting parent,* the same as a natural parent. |
| An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by the adoption, | An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by adoption, |
| nor does such natural parent succeed to the estate of such adopted child." | nor does such natural parent succeed to the estate of such adopted child, |
| | *nor does such adopted child succeed to the estate of a relative of the natural parent, nor does any relative of the natural parent succeed to the estate of an adopted child."* (Italics added.) |

able in *Estate of Stanford*, 49 Cal.2d 120 [315 P.2d 681], and *Estate of Heard*, 49 Cal.2d 514 [319 P.2d 637], cases subsequent to the amendment to section 257, but in which the amendment could not be applied, death of the testators having occurred before it went into effect.)

We recognize that the decisions since 1955, cited above, involve rights of succession and not testamentary dispositions, and that the case before us must be decided on our own interpretation of the statutes.

3. There is logic to the conclusion that the adoptee no longer is kindred of her natural siblings. The statutes of succession, although they do not use the precise word "kindred," do recognize kindred as kindred, and not merely as the terminal points of imaginary lines of succession. For although section 257 refers in rather technical and impersonal terms to "succession by, from and through the adopting parent," the succession statutes themselves use the ordinary terms of family relationship. For example, under Probate Code section 225, if the decedent leaves neither issue, spouse nor parents, the estate goes "to his brothers and sisters and to the descendants of deceased brothers and sisters by right of representation." Surely, brothers and sisters are kindred. Therefore, the amendment to section 257, to be effective, must create new brothers and sisters, kindred, in the eyes of the law, for an adoptee; and, of course, the statute of succession works both ways and makes the adoptee a brother or sister, and therefore kindred for inheritance purposes, of the new adoptive siblings.

As another example, let us suppose that an adopted child dies intestate leaving neither issue, spouse, parent, brother, sister nor descendant of a deceased brother or sister. The statute (Prob. Code, § 226) provides that the estate goes to the next of kin. Is there any doubt that since 1955 the next of kin are the kin acquired by adoption, and no others? If it were not so, the new plan of succession set forth in section 257 would be defeated. It appears, therefore, that a new line of kin exists.

Now, to go a step farther, we shall give examples in which not merely succession but testamentary dispositions are, we believe, necessarily affected by the amendment to section 257. If a testator makes a gift to a class, such as "to my brothers and sisters," no other evidence of testamentary intent being present, must it not be held that the devise is to the adoptive brothers and sisters? If it were not so, there would exist the

confusion and, frequently, the injustice which we think the amendment was intended to prevent.

To take another example, let us suppose that a testator makes a devise to his "nearest (or next) of kin." Under section 108 of the Probate Code, this vests the property in those who would be entitled to succeed under the statutes of succession. If an adopted testator were to make such a devise, this devise to his nearest kin would go to his adoptive relatives under the statutes.

As a final example, let us consider a case where the antilapse statute itself would apply, where the predeceased devisee is on the adoptive side. Let us suppose the adoptee made a devise to a named adoptive brother, who had predeceased him, leaving lineal descendants. We think it cannot be doubted that the antilapse statute would apply, on the proposition that the adoptive brother was testator's "kindred." Or, suppose he made a devise to his "brothers and sisters" as a class gift. This is considered a devise to kindred and does not lapse (*Estate of Steidl*, 89 Cal.App.2d 488 [201 P.2d 58]), but since the amendment to section 257, as we interpret it, creates in legal effect new brothers and sisters, if one of the brothers or sisters predeceased the testator, it would follow, we believe, the antilapse statute saves the devise for the lineal descendents.

These examples have been given not to decide cases not pending, but to show that the concept of kindred is woven into the whole law of succession and of wills in such manner that when the 1955 amendment was made, a new concept of "kindred" of adopted children was created, else there will continue a split relationship of an adoptee. Whether or not the antilapse statute is, strictly speaking, a law of succession does not seem to be a controlling factor. Although, as respondents argue, it is based on the presumed intention of the testator, nevertheless the persons acquiring rights under the antilapse statute acquire them as substitutes, thrust, by force of the statute, into the vacant place of the named legatee. (*Estate of Pew*, 10 Cal.App.2d 41, 44 [50 P.2d 1045].)

Respondents cite *Estate of Esposito*, 57 Cal.App.2d 859 [135 P.2d 167], decided in 1943, 12 years before the amendment to section 257. The opinion contains dictum which is favorable to respondents' interpretation of the word "kindred," and to their contention that the antilapse statute relates to wills and not to succession. Actually, however, there was no question that the devisee who predeceased the

testator was his kindred. He was the testator's son. The question was whether the natural child of this devisee was still the son's lineal descendant, after she had been adopted by others, and it was held that she was, although she was also lineal descendant of her adoptive parents.

We agree with learned commentators: Witkin (4 Summary of California Law, p. 3147), that "the 1955 revision of Prob. C. § 257 has probably nullified the rule of this [*Esposito*] case"; and Armstrong (2 California Family Law, [1961 Supp., p. 442, n.]), that "The *Esposito* case, in the light of the 1955 version of Prob. C. § 257, would seem to have lost its legal basis."

It may be that testatrix would have preferred that the devises which her brother and sister could not have because of death, should go to their children or grandchildren, than that the relatives she acquired by adoption and by the change made in the law in 1955, should take. We are interpreting a statute, however, and not construing an. ambiguous will. In doing this, we must have in mind consequences that transcend the individual case. In any particular case, a testator may do as he pleases, subject to but few limitations. He can avoid the necessity for use of the antilapse statute.

The statutes operate impersonally. An adoptee shares in the estate of his intestate adoptive relatives, whether they would have wished it or not. He does not succeed to the estate of natural relatives, whether they would have desired it or not.

We believe that the public policy of the state is to give to an adopted child the same status as a biological one (*Estate of Heard*, 49 Cal.2d 514, 519 [319 P.2d 637]) and that in the light of this policy, the kindred of an adopted person are its adoptive relatives, not its biological ones.

Judgment for proponents in will contest affirmed. Judgment determining interests in estate reversed. Each side to bear own costs on appeal.

Draper, P. J., and Salsman, J., concurred.

The petitions for a rehearing were denied December 30, 1963, and the petitions of the appellants and the respondents for a hearing by the Supreme Court were denied January 29, 1964. Schauer, J., McComb, J., and Peters, J., were of the opinion that the petitions should be granted.