E.S. Pillsbury died intestate in an automobile accident in which also his wife was killed. He survived her and left surviving him three minor children, the eldest about the age of fourteen years. His life was insured, the face values of his seven policies amounting to twenty-seven thousand dollars. They were all payable to his wife and in the event of her predecease then to his executors, administrators, or assigns. The proceeds of these policies therefore fell into his estate, and upon them his estate realized over twenty-four thousand dollars, which passed into the hands of its administrator.
A.C. Pillsbury, a brother of the deceased, applied for letters of administration on September 14, 1911, and his application was denied on October 6, 1911. On that date, however, *Page 456 
A.C. Pillsbury and his wife were appointed guardians of the persons of the minor children of deceased, and the Title Insurance and Trust Company, the respondent herein, was appointed guardian of their estates. Then on November 13, 1911, these minors were legally adopted by A.C. Pillsbury at Oakland, in the county of Alameda, state of California. Thereafter, and on the twenty-fourth day of November, 1911, letters of administration in the above-entitled estate were issued to the Title Insurance and Trust Company. This was the first and only appointment of an administrator. On December 28, 1912, this administrator filed its first and final account of its administration, which final account showed disbursements of a large part of the moneys derived from the insurance policies in payment of the approved claims of creditors. On September 25, 1913, A.C. Pillsbury and his wife, as guardians of these minors, filed amended objections and exceptions to this account and on the same date filed an amended petition asking that the life insurance money collected by the administrator be set apart to the minors as property exempt from execution. This, after hearing in which testimony was taken, the court in probate refused to do, and this appeal has followed.
Appellants' first contention is that by force of our statutes this insurance money was set aside to the minor children of deceased; that the administrator, whose duty it was to collect it, had no other or further power of disposition over it than to see that it went to the minors as property exempt from execution. The sections of our Code of Civil Procedure which control the matter are section 690, subdivision 18, which, in enumerating the kinds of property exempt from execution or attachment, specifies "all moneys, benefits, privileges, or immunities accruing or in any manner growing out of any life insurance," etc., and section 1465 of the same code, which declares that "upon the return of the inventory, or at any subsequent time during the administration, the court may on petition therefor, set apart for the use of the surviving . . . minor children of the decedent, all the property exempt from execution."
The construction of these laws for which appellants contend is that ex proprio vigore they work a setting apart, an exemption from execution, and that they operated with this force immediately upon the death of the deceased. But to *Page 457 
this answer must be made that such a construction never has been given to these laws, but, to the contrary, they have always been construed as granting merely a privilege which the possessor of the privilege may waive or exercise at his pleasure. Thus in the early case of Borland v. O'Neal, 22 Cal. 505, it is said: "The exemption of property from sale on execution is a personal right which the debtor may waive or claim at his election." To the same effect are Keybers v.McComber, 67 Cal. 395, [7 P. 838], and Stanton v. French,83 Cal. 195, [23 P. 355]. In the matter of the probate of an estate, the governing principle in construing section 1465 of the Code of Civil Procedure is the same in the case of all other exempt property as it is in the case of a homestead, and as to the homestead it has uniformly been declared that it is but a privilege, and a privilege which must be exercised in time. It is not a vested right, but one whose validity is to be determined in most instances by the conditions which exist at the time the application is made. (Estate of Boland, 43 Cal. 640; Estate of Moore, 57 Cal. 446; Estate of Moore, 57 Cal. 437. ) "In no case can the right be said to be fixed before the date of the application." (Estate of Heywood, 149 Cal. 129, [84 P. 834].) The absolute identity in principle between the setting apart of a homestead under section 1465 of the Code of Civil Procedure and the setting apart of all other property declared to be exempt from execution is announced and established in Estate of Moore, 57 Cal. 446.
Appellants next insist that as the application on behalf of the minors to have this insurance fund set apart as property exempt from execution was timely made, in that it was made while the children were still minors and made before the settlement of any of the administrator's accounts, it is the duty of the court to treat the fund as still in the possession of the administrator and to order that it be set apart as prayed for. But to this respondent answers that the moment the children were legally adopted by A.C. Pillsbury and his wife, they ceased to be of the family of E.S. Pillsbury, deceased, and therefore ceased to be of the classes for which alone property may be set apart as exempt from execution. Those classes, as defined in Estate of Boland, 43 Cal. 649, are "two classes, the widow and the family of the deceased." That the law contemplates that its beneficence in the matter of these exemptions shall be extended only to these classes, *Page 458 
our decisions leave no doubt. "The objects of administration are: First, to support the family for a period; second, to set apart a homestead to the family; third, to pay the expenses of administration; fourth, to pay the debts of the deceased; fifth, to distribute the balance of the estate to those who take it by law." (Estate of Moore, 57 Cal. 437.) "The manifest object of the section (1465) is the support of the family and to make provision for their support and maintenance. These demands of the family are deemed superior to those of the heirs or creditors." (Keyes v. Cyrus, 100 Cal. 322, [38 Am. St. Rep. 296, 34 P. 722].) "When the widow, Grace U. Still . . . intermarried with William Webb, she lost her right to have a homestead carved out of the property of the estate of her deceased husband; and when all the minors except Samuel W. Still reached their majority without an application for a homestead having been made for or on their behalf, their rights were similarly lost." (Estate of Still, 117 Cal. 509, [49 P. 463].) That insurance money stands in precisely the same category as other properties of an estate which may be exempted is also established beyond the reach of successful controversy. Thus in Estate of Miller, 121 Cal. 353, [53 P. 906], treating of insurance funds, it is said: "Although set apart under the statute, the money is administered upon, and until so set apart is a part of the estate. The order setting it apart is a species of distribution." In Keyes v. Cyrus, supra, it is said that the authority to set apart property exempt from execution "implies that the property when set apart is exempt from execution." In Holmes v. Marshall, 145 Cal. 777, [104 Am. St. Rep, 86, 2 Ann. Cas. 88, 69 L. R. A. 67, 79 P. 534], where the widow had received insurance money from two sources, the one where she was the direct beneficiary of the policy, the other where the policy was, as here, payable to the executors, administrators, or assigns and the court had set the latter apart to her, the argument was presented that only those funds which came to her directly were exempt, and this court said: "We can see no reason why the insurance money coming to her directly as beneficiary should be exempt from execution, and not that coming to her indirectly, through the estate and the order setting it apart. In either case it is exempt from execution. In one case, the instrument of life insurance gives her the title, in the other the law gives it to her." *Page 459 
Touching the time of the application of these minors to have this fund set apart to them, it is to be noted that it was made after they were legally adopted into the family of A.C. Pillsbury, and that this adoption was an accomplished fact before any administrator of the estate of the deceased had been appointed. Therefore no dereliction of duty can be charged against this respondent as guardian of the estate of these minors for not having itself caused this application to be earlier made, since by the language of section 1465 such an application can only be made "upon the return of the inventory" or thereafter, and at the time of the return of the inventory the minors were the adopted children of A.C. Pillsbury. Thus we come to the fundamental question — the effect upon the rights of the minors of their adoption as children into the family of A.C. Pillsbury. Unquestionably, since this followed the death of their father, it did not affect their status as his heirs. Whatever rights as heirs had descended to them upon the death of their ancestor they still retained. But, upon the other hand, by virtue of their adoption the minors not only became members of the family of the adopting parents, but ceased to be of the family of the deceased, and this is formally declared inEstate of Jobson, 164 Cal. 312, [43 L. R. A. (N. S.) 1062,128 P. 938], where it is said: "These various rulings seem to establish the doctrine that the effect of an adoption under our Civil Code is to establish the legal relation of parent and child, with all the incidents and consequences of that relation, between the adopting parent and the adopted child. This necessarily implies that the natural relationship between the child and its parents by blood is superseded. The duties of a child cannot be owed to two fathers at the same time." No considerations of conceived hardship upon the minors can operate to modify the legal effect of this changed status. If it be said that by virtue of their adoption, they being in their helpless minorities and unable to exercise any independent judgment in the matter of the proceedings, they were wronged, it must be answered that by virtue of their tender infancy they are in an especial sense wards of the court in equity, and it must be presumed that in its adoption decree that court acted for the best interests of the minors. Of course, if a case shall arise where such a decree was procured and entered in fraud of the minors' rights, equity will grant its relief by a vacation of *Page 460 
that decree upon proper bill for that purpose. But such is not the case here presented, and it must be concluded that the minors at the time of this application were not of the family of the deceased, but were of the family of the adopting parents.
There remains to be considered their rights as heirs of the deceased, which rights, as we have said, stand unaffected. Herein it is contended that one payment which the administrator admittedly made was without warrant of law, and that consequently the amount of that payment must be treated as money still in the estate. It appears that the deceased who, in his lifetime, was a physician and surgeon, had been sued for damages for malpractice. He filed an answer and made a motion for a change of venue, which was denied. He did not appeal from this order of denial and the time for appeal had expired before his death. He had waived trial by jury, he had accepted notice of the trial, he had made an ineffectual attempt to secure counsel in Inyo County to represent him, and, failing in this, neither put in an appearance at the time of the trial nor was he there represented. The trial was had and concluded two days before his death. Ignorant of that death, the trial court entered its judgment against deceased two days after his death. Several months thereafter, and being advised of the death, the court, upon motion of plaintiff in the action, and against the opposition of this respondent, entered the same judgmentnunc pro tunc as of the day of the submission of the cause for determination. From this judgment so entered respondent took no appeal, and the amount of the judgment having been presented as a claim against the estate and having been approved by respondent and by the court in probate was paid in due course of administration. The amount of this claim was $9,018.32. The action resulting in this judgment, as has been said, was for malpractice. It was to recover damages sustained by plaintiff's wife for injuries inflicted upon her while she was the patient of the deceased. An action for malpractice may have its basis either in a willful injury, an injury occasioned by negligence, or, finally, in the doing of that which is forbidden by positive law. But in every instance the action sounds in tort. (Abbott v. Mayfield, 8 Kan. App. 387, [56 P. 327];Rodgers v. Kline, 56 Miss. 808, [31 Am. Rep. 389]; Tucker v. *Page 461 Gillette, 22 Ohio C.C. 664; Boor v. Lowrey, 103 Ind. 472, [53 Am. Rep. 519, 3 N.E. 151].)
The question presented, then, is, under the facts shown did the right of the plaintiff in his damage suit to have the judgment entered after the death of the wrongdoer survive?
Under the maxim, Actus curiae neminem gravabit, courts of law and courts of equity from very early times exercised the power of entering judgments and orders nunc pro tunc in order that the rights of the litigant who was himself not at fault should not be impaired or lost. As a specific application of this maxim it is stated in Bacon's Abridgment, title "Abatement F": "If the plaintiff or defendant die whilst the courts are considering of their judgment or after a special verdict or special case and pending the time for argument or for advising thereon . . . they will permit the judgment to be entered as of the term for which it might have been." This power, it has been declared in this state, is inherent in the courts, and elsewhere it has been questioned whether it was within the power of the legislature to deprive the courts of it, making as it does so manifestly for justice. (Fox v. Hale Norcross,108 Cal. 478, [41 P. 328].) Where the suitor is not at fault, the determinative consideration moving the court is whether or not the action at the death of the party was ready for the rendition of final judgment. (Freeman on Judgments, sec. 59.) And, says this court in Fox v. Hale Norcross, supra: "A nuncpro tunc order should be granted or refused as justice may require in view of the circumstances of the particular case." Our only statute bearing upon the question is section 669 of the Code of Civil Procedure, which declares as follows: "If a party die after a verdict or decision upon any issue of fact, and before judgment, the court may nevertheless render judgment thereon. Such judgment is not a lien on the real property of the deceased party, but is payable in the course of administration on his estate." Appellants' first contention upon this proposition is that here is shown a limitation upon the power of our courts thus to enter nunc pro tunc judgments and that limitation is that a verdict must have been rendered or a decision given, or the court is powerless to enter judgment. But in Fox v. Hale Norcross, supra, this section was construed and the construction put upon it is wholly antagonistic to appellants' view. It is there said that the section "does *Page 462 
not, however, do away with the rule that authorizes the court to direct that its decision, so far as the same shall be necessary to protect the rights of the parties, shall be entered nunc pro tunc, as of a day anterior to the death of the party." The principle, as has been said, is founded upon the plainest considerations of justice. In an action ex delicto,
which unquestionably before trial dies with the wrongdoer, it is the more important that the principle should be invoked than in cases where the right of action survives and the worst that can happen to the surviving litigant is a retrial or a change of forum. So it will be found without citing specific instances that the trend of legislation is to broaden even the common-law rule and to provide that the right of action shall survive in cases ex delicto if the defendant has appeared or has been served with process, while a brief consideration of the adjudged cases will show that nowhere is the principle enunciated denied application because the action is in tort. The quotation from Bacon's Abridgment, supra, it will be noticed, does not do so, and specifically declares that the party shall have relief if his adversary die "whilst the courts are considering of their judgment," which was precisely the situation here presented. Our own cases do not draw the distinction contended for, but state the principle broadly, as always elsewhere it is stated, and upon this precise question the supreme court of Connecticut has thus declared itself: "But it is needless to multiply cases; for it is conceded that this is law with respect to all cases which survive, and in which the executor may enter. But it is contended that the practice does not extend to cases of tort which do not survive. We find no such distinction made in the books. On the contrary, the general principle is laid down without such a limitation; and certainly we should not feel disposed to introduce such a limitation, as we do not think it founded in reason. On the contrary, we find that in cases which were of a character that they would not survive, this practice has been adopted." (Brown
v. Wheeler, 18 Conn. 199.) In Perry v. Wilson, 7 Mass. 393, where the action was ex delicto and the court took the case under advisement, the defendant having died before decision or judgment, a nunc pro tunc judgment was entered, the court saying that "they would always take care that no party should suffer by their delay." In Hocks v. Sprangers, 113 Wis. 143, [89 N.W. 117], the action *Page 463 
being ex delicto for slander, the court applied the principle, declaring: "The foundation principle upon which the power rests is that no one should be allowed to lose the legitimate fruits of litigation to which he is a party by mere delay in the administration of the law, whether that delay be caused by the act of the court alone, or by the act of the party against whom relief is sought, or of his counsel." In Dawson v. Waldheim, 89 Mo. App. 245, the action was ex delicto, and the circuit court rendered a judgment after the death of the defendant, and then, as here, entered a nunc pro tunc judgment upon being advised of the death. The supreme court declared that "we uphold the action of the circuit court on the broad ground that a court may, in the exercise of its common-law power, as a general rule when the state of the record or the minutes kept by the court or clerk show that a suitor was entitled to a particular judgment but that the judgment was not entered at the term when it should or might have been entered, at a subsequent term cause the proper judgment to be entered to relate back to the term when it should have been entered, provided the delay was not occasioned by the party applying." And finally, in Mitchell
v. Overman, 103 U.S. 64, [26 L.Ed. 369], it is said: "We content ourselves with saying that the rule established by the general concurrence of the American and English courts is, that where the delay in rendering a judgment or a decree arises from the act of the court, that is, where the delay has been caused either for its convenience, or by the multiplicity or press of business, either the intricacy of the questions involved, or of any other cause not attributable to the laches of the parties, the judgment or the decree may be entered retrospectively, as of a time when it should or might have been entered up. . . . Anunc pro tunc order should be granted or refused, as justice may require in view of the circumstances of the particular case."
Wherefore, it is concluded that the judgment entered against respondent's intestate was a valid judgment.
It is finally urged that respondent was remiss, and therefore should be held to the amount of the judgment in having failed to appeal from it or to seek a compromise of it. No showing is made that an appeal if prosecuted would have been successful or would have resulted in anything other than the imposition of additional and useless expense against and on *Page 464 
the estate, and we are cited to no law, and know of none, which makes it the duty of any trustee to seek to compel a creditor to accept less than his just demand.
A subsidiary contention of appellant is that the fact that these minors were adopted cannot here be considered, for the reason that the record of adoption was not formally offered and received in evidence. An examination of the transcript shows this contention to be absolutely without merit. The papers were not only actually offered but actually read in evidence.
Wherefore, the decree appealed from is affirmed.
Shaw, J., Sloss, J., Melvin, J., and Angellotti, C. J., concurred.