[Civ. No. 20670. First Dist., Div. Two. Mar. 21, 1963.]

Estate of HARRY ANDREW PETERSON, Deceased. CHOICE PETERSON, Claimant and Appellant, v. HELEN H. ANDERSON, Claimant and Respondent.

Daniel S. Carlton, Cameron Wolfe and Richard J. Asbill for Claimant and Appellant.

Cooper, Wiles & Barry, Cooper & Wiles, Daniel E. Cooper and Robert J. Wiles for Claimant and Respondent.

SHOEMAKER, J.—This is an action to determine heirship to the estate of Harry Andrew Peterson, who died intestate on June 16, 1959. The basic controversy is between claimant and respondent Helen Anderson, who claims to be the legitimated daughter of the decedent, and claimant and appellant Choice Peterson, the granddaughter of Alice Peterson, the predeceased spouse of the decedent. Helen Anderson's claim of heirship is based on legitimation for succession purposes under Probate Code, section 255, or, in the alternative, legitimation for all purposes pursuant to Civil Code, section 230. The claim of Choice Peterson is based on the fact that the majority of the property in the decedent's estate was the community and separate property of her grandmother, Alice Peterson, to which, pursuant to Probate Code, sections 228 and 229, she would be entitled if the decedent died leaving neither spouse nor issue.

The evidence may be summarized as follows: In 1918, Hazel Eastlick, the mother of claimant Helen Anderson, was living in Vancouver, Washington, at the home of her mother. In addition to the immediate family, two brothers, Hugh and Frank Izer, boarded at the Eastlick home. Sometime after July 4, 1918, Hazel, who was then 17, became sexually intimate with Hugh Izer. Shortly thereafter, Mrs. Eastlick became suspicious of her daughter's conduct and ordered the Izer brothers to leave the home. Although Hugh Izer attempted to communicate with Hazel and sent a message to the home, Mrs. Eastlick tore up the letter and instructed the messenger to tell Mr. Izer that she would have him put in the penitentiary if she ever saw him again. When Hazel subsequently learned that she was pregnant, her mother informed her that Hugh Izer was dead, and she therefore made no attempt to contact him. On March 16, 1919, the claimant Helen Anderson was born. Hazel Eastlick named Hugh Izer as the father on the child's birth certificate.

Helen Anderson grew to adulthood under the belief that her father was dead. However, in the course of obtaining employment in southern California, she had occasion to obtain her birth certificate from her mother and noticed that Hugh Izer was listed as her father. In 1953, Helen was visiting her aunt in Portland, Oregon, and looked in the telephone book to see if there were any Izers listed. Upon calling a Maude Izer and inquiring whether she knew a man by the name of Hugh Izer, Helen learned that he was Maude's son, and that he was not dead, but was residing in Oakland, California, under the name of Harry Peterson.

Helen then wrote to Harry Peterson, stating that she was attempting to contact the Eastlick family and had reason to believe that he had once roomed with them and might know where they were presently living. Upon receiving a reply to the effect that he had boarded with the Eastlicks at one time but had no knowledge of their whereabouts, Helen again wrote and informed him that she had reason to believe he might be her father. Mr. Peterson wrote back, requesting that Helen come to Oakland and meet with him.

In September 1953, Helen and her husband came to Oakland and met Harry Peterson and his wife, Alice. During the course of the visit, Mr. Peterson had a private discussion with Helen, and acknowledged paternity. After Helen returned to her home in southern California, she continued to correspond with Mr. Peterson and made occasional visits to Oakland in

1955 and 1956. In his letters to her, Mr. Peterson addressed her as "darling daughter" and "dear daughter." The letters were signed "Dad." In her visits to Oakland, Helen would spend the weekend with Mr. and Mrs. Peterson at the rest home which they owned and operated. During these visits, both Mr. and Mrs. Peterson welcomed Helen into the home and introduced her to friends as "Harry's daughter" and "our new daughter." In May of 1958, Alice Peterson died, and Harry Peterson's health thereafter steadily failed. His last letter to Helen was written on April 17, 1959, two months before his death.

Upon this evidence, the trial court found that claimant Helen Anderson was the natural daughter of the decedent, that he had acknowledged her to be his daughter pursuant to Probate Code, section 255, and that he had also legitimated her pursuant to Civil Code, section 230. The court accordingly decreed that the entire estate be distributed to Helen Anderson as the sole heir at law of the decedent. Claimant Choice Peterson appeals from this judgment and decree of distribution.

Appellant contends that the evidence was insufficient to support the trial court's findings that the decedent fulfilled the requirements of either Civil Code, section 230, or Probate Code, section 255. Turning first to Civil Code, section 230, that statute provides as follows: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. . . ." Appellant asserts that there was no proof of compliance with this section because there was no evidence (1) that the decedent was in fact the natural father of respondent; (2) that the decedent received respondent into his family with the consent of his wife; and (3) that the decedent otherwise treated respondent as if she were legitimate.

■■ Taking these contentions in order, it is apparent that there was ample evidence in support of the trial court's finding of paternity. The decedent's brother, Frank Izer, testified that the decedent's given name was Hugh Izer, but that he had subsequently changed it to Harry Andrew Peterson and that the decedent had boarded with the Eastlick family during the year 1918. Respondent's mother Hazel Lavender (formerly Hazel Eastlick) testified that she had had sexual relations with the decedent, and with no other man, during the

summer of 1918; that she became pregnant as a result; and that respondent was born on March 16, 1919, at which time she listed the name Hugh Izer on the birth certificate as the father. In addition to this evidence, which would in itself appear sufficient to support a finding of paternity, the decedent himself acknowledged his paternity to respondent during the course of her 1953 visit. Three witnesses in addition to the trial judge himself, commented on the strong physical resemblance between respondent and the decedent. This evidence was clearly sufficient to support a finding of paternity.

Appellant's next contention is that respondent was never received into the decedent's family with the consent of his wife. It is appellant's position, first of all, that mere weekend visits to the decedent's home were insufficient as a matter of law to constitute reception into the family. Appellant also asserts that there was no evidence whatever that the decedent's wife, if she did consent to receive respondent into the family, did so with knowledge of her illegitimacy.

Although respondent never lived with the decedent and his family for any prolonged period of time, the facts are that respondent, at the time of her initial 1953 meeting with her father, was 34 years of age and was living in southern California with her husband and children. To require respondent, as a condition of legitimation, to leave her own family and take up residence with her father for a prolonged period of time would serve no useful purpose whatever, and would defeat the liberal interpretation which the courts have always accorded section 230. (*Estate of Lund* (1945) 26 Cal. 2d 472, 481 [159 P.2d 643, 162 A.L.R. 606] ; *Estate of Wilson* (1958) 164 Cal.App.2d 385, 388 [330 P.2d 452].) The term "child," as utilized in section 230, includes both minors and adult persons. (Civ. Code, § 221.) It is apparent that few adults, however desirous they might be of attaining a legitimate status, would be willing to abandon their own families and leave their settled places of residence in order to achieve this goal. In any event, it is well settled that it was never the intent of the Legislature to impose such a requirement, even in those cases, involving minor children. In *Estate of Wilson, supra,* for example, the court held that there had been a sufficient reception into the family where the child was brought on occasional visits to the home of her father and his wife. The longest of these visits was from "noon to dusk." (P. 387.) In the instant case, respondent and her father corresponded regularly after their 1953 meeting, and respondent made at least two additional weekend visits to Oak-

land in 1955 and 1956. During the course of these visits, she stayed with the decedent and his wife at the rest home where they lived, ate her meals at the family table, and was introduced to their friends as "Harry's daughter" and "our new daughter." This evidence was clearly sufficient to support a finding that she had been received into the decedent's family.

Appellant asserts, however, that the decedent's wife consented to receive respondent into the family only because she was unaware of respondent's illegitimate status. In support of this argument, appellant points out that the decedent's wife, Alice, knew that the decedent had previously been married to a woman named Cora. Under such circumstances, appellant contends that Alice undoubtedly believed respondent to be a legitimate child of this prior marriage and consented to receive her into the home on that basis. This argument is wholly without merit. Respondent testified that the circumstances of her birth were well known to the decedent's wife, and that on one occasion she and Alice had discussed the matter privately and agreed that it would be best not to inform the decedent of the present whereabouts of respondent's mother. In view of this testimony, there was ample evidence in support of a finding that the decedent's wife had actual knowledge of respondent's illegitimate status when she consented to receive her into the family. Although appellant points out that the trial court made no finding of actual knowledge and found only that Alice had given her consent, this fact is of no great import. The rule is well settled that findings should state ultimate facts and not evidentiary facts or conclusions of law. (*Biurrun* v. *Elizalde* (1925) 75 Cal. App. 44, 55 [242 P. 109] ; *Hayward Lbr. etc. Co.* v. *Construction etc. Corp.* (1952) 110 Cal.App.2d 1, 3 [241 P.2d 1054].)

The language of Civil Code, section 230, contains no reference to knowledge, but requires only that the "consent" of the wife be given. Neither did the parties, in their pleadings, make any reference to knowledge as an element separate and apart from consent. The obvious reason for this omission is that a finding of consent necessarily embraces a probative finding of knowledge. In the present case, the court made findings upon all of the issues raised by the pleadings. These findings were properly confined to the ultimate facts, and appellant's counsel made no objection in the trial court to their alleged insufficiency. Under such circumstances, it was unnecessary for the court to adopt findings stating in detail the probative and evidentiary facts of the

case. (*Forman* v. *Hancock* (1934) 3 Cal.App.2d 291, 295-296 [39 P.2d 249]; *Kalmus* v. *Cedars of Lebanon Hospital* (1955) 132 Cal.App.2d 243, 245-246 [281 P.2d 872].) ▮ The finding that the decedent's wife consented to receive respondent into the family necessarily encompassed a finding that this consent was given with knowledge of respondent's illegitimacy.

▮ Appellant's final contention is that there is no evidence that the decedent, in addition to receiving respondent into his family, otherwise treated her as if she were his legitimate child within the meaning of Civil Code, section 230. This argument is untenable. An examination of the letters which the decedent wrote to respondent from the time of their 1953 meeting until shortly before his death reveals that the relationship between father and daughter was an extremely close and affectionate one. In these letters, the decedent stated that he frequently looked at respondent's picture and wished that he had been a better father to her; that he was proud of her, thought she was a wonderful daughter, and wished that he could see her more often; and that her visits gave him more pleasure than anyone could imagine. On respondent's birthday, the decedent sent her a card and enclosed a $5 bill. He looked forward to her visits with great eagerness and informed friends that it was wonderful to have someone else in the family that he was "close to." When respondent came to visit him, the decedent treated her with great affection and introduced her to friends as his "daughter."

Under such circumstances, the trial court was clearly correct in holding that respondent was legitimated for all purposes under Civil Code, section 230. ▮ It therefore becomes unnecessary to determine whether there was also support for the finding that the decedent acknowledged respondent as his daughter in the manner required by Probate Code, section 255. The two statutes provide alternative methods by which a person may become the heir of his father. (*Estate of Garcia* (1949) 34 Cal.2d 419, 421 [210 P.2d 841].)

Judgment affirmed.

Kaufman, P. J., and Agee, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 14, 1963.