[Civ. No. 27182.    Second Dist., Div. Four.    June 17, 1964.]

PAUL HURST, Plaintiff and Appellant, v. PEGGY HURST, Defendant and Respondent; PAUL MARK HURST, a Minor, etc., Movant and Respondent.

[Civ. No. 27460.    Second Dist., Div. Four.    June 17, 1964.]

PAUL MARK HURST, a Minor, etc., Plaintiff and Appellant, v. PAUL HURST, Defendant and Appellant.

(Consolidated Cases.)

Charles S. Stevens, Jr., and John E. Glover for Plaintiff and Appellant in No. 27182 and Defendant and Appellant in No. 27460.

Gustafson, Thompson, Cohen & Ferguson and Roy A. Gustafson for Movant and Respondent in No. 27182 and Plaintiff and Appellant in No. 27460.

No appearance for Defendant and Respondent.

KINGSLEY, J.—In this proceeding we are concerned with three appeals. In appeal number 27182, Paul Hurst has appealed from the order granting a final judgment of divorce *nunc pro tunc* as of August 21, 1957, and from said final judgment of divorce. In appeal number 27460, Paul Hurst, defendant in that action below, has appealed from a judgment determining him to be the father of one Paul Mark Hurst, decreeing that said Paul Mark Hurst is his legitimate son; ordering him to support said child and awarding attorney's fees to the child's counsel. Plaintiff, Paul Mark Hurst, by his guardian *ad litem*, has appealed from that portion of the judgment awarding him $10,000 as attorney's fees on the ground that the award is inadequate.

Since the appeal as to the validity of the court's action in entering the final decree of divorce *nunc pro tunc* is so interwoven with the issue of legitimation we will presently postpone a discussion of that appeal so that we may integrate the points therein raised with the discussion on the issue of legitimation. In this manner, it is hoped that a better and more complete understanding of the issues involved may be had.

For the present, concerning ourselves solely with appeal number 27460, and stating the facts, as we must, favorably to respondent, we find the following:

On February 7, 1961, plaintiff by his guardian *ad litem* filed suit against defendant for declaratory relief. The complaint is cast in two counts. The first count seeks to establish that defendant is the father of the plaintiff, and the second count seeks a determination that defendant had adopted (legitimated) plaintiff pursuant to section 230 of the Civil Code.

Defendant interposed an answer wherein he denied the allegations of plaintiff's complaint and then proceeded to set up various affirmative defenses. At the pretrial conference, pursuant to section 597 of the Code of Civil Procedure, the second, third, fifth and seventh affirmative defenses were ordered tried by the court without a jury, before the trial of the other issues raised by the pleadings.

The second and third affirmative defenses are directed to the first cause of action in the complaint. The second pleads res judicata, the third that another action is pending which abates the present first cause of action. The fifth affirmative

defense relates to the complaint's second cause of action, and repleads the second and third defenses to the first cause of action. The sixth and seventh affirmative defenses are against both causes of action in the complaint, the sixth alleging the defenses of laches, and the seventh the defense of estoppel.

## I

### THE ISSUE OF PATERNITY

Defendant does not appear to seriously question that he is in fact the father of the plaintiff. It will suffice to say, without elaborating unnecessarily, that the evidence more than abundantly supports such a finding. Defendant's primary position with regard to the issue of paternity is that, by virtue of an order approving a compromise and settlement in a prior paternity action between the same parties, plaintiff should not have been allowed in the present action to prove that he is the father. Defendant contends that the compromise and settlement in the former paternity action was entered into with the understanding that defendant would support plaintiff upon condition that there be no finding of paternity, and that the issue of defendant's paternity could only be reasserted after his (defendant's) death or when he came into the corpus of a trust fund set up for his benefit by his mother.

While there is some conflict in the cases as to whether or not a guardian of a minor may validly stipulate to nonpaternity in consideration of an agreement by the alleged father to support the minor, this issue is not now before us. Neither the stipulation nor the order compromising plaintiff's claim in the first paternity action determines whether or not defendant was the father, nor does it preclude plaintiff from ever instituting appropriate legal action to have such a determination made. Furthermore, we cannot adopt defendant's contention that the compromise and settlement in the first paternity suit put plaintiff's claim of defendant's paternity in a state of suspended animation until after his death, or when he (defendant) comes into possession of the corpus of a trust set up for his benefit.

The court order in the earlier action, which was the only official action taken by the court, contains no provision suspending a determination on the issue of paternity as contended by defendant. Defendant counters this position by asserting this determination was made during oral negotiations on the compromise and settlement. However, Judge Hecken-

dorf, the judge in the previous paternity suit and the judge who sat in on the oral negotiations and who approved the compromise and settlement, in substance testified that the question of plaintiff's paternity could be raised by plaintiff at any time. While it is true that this witness's testimony was contradictory on this point in that he also testified plaintiff was precluded from having his paternity established during defendant's lifetime, the court's determination to the contrary is adequately supported by a fair reading of the settlement and compromise plus the testimony of Judge Heckendorf and thus is binding on this court. (*Estate of Rule* (1944) 25 Cal.2d 1 [152 P.2d 1003, 155 A.L.R. 1319].)

█ Since the first action made no adjudication as to paternity, and in fact it was mutually agreed that the issue of plaintiff's paternity should not then be adjudicated, the defense of res judicata is not available to defendant. (*Stark v. Coker* (1942) 20 Cal.2d 839 [129 P.2d 390].) Defendant also contends that the first paternity action is still pending and as such it is a bar to plaintiff's present action. Defendant seems to overlook the fact that the former action was settled. It is true one of the issues was left unresolved, *i.e.,* paternity, but the lawsuit as such was terminated. If anything in this case is sure it is that the settlement agreement was thought and intended by everyone concerned to end at least that particular suit. In the face of this clear purpose and intent, it would be incongruous to hold that the earlier action is still pending.

## II
### THE ISSUE OF LEGITIMATION

Section 230 of the Civil Code provides: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. ...."

█ Prior to the trial on the issue of plaintiff's paternity and legitimation, plaintiff was faced with a factual setting which showed that, between the time of his birth and September 26, 1957, defendant was a married man, and although he was living separate and apart from his wife, his wife's consent was still required for receipt of plaintiff into his family, and without such consent no adoption (legi-

timation) could have taken place during this period. (*Adoption of Graham* (1962) 58 Cal.2d 899 [27 Cal.Rptr. 163, 377 P.2d 275] ; *Laugenour* v. *Fogg* (1942) 48 Cal.App.2d 848 [120 P. 690].)

Plaintiff urges us to distinguish the two cases just cited, which clearly hold that the consent of the wife is necessary even though the father is living separate and apart from an estranged wife, on the ground that, in the instant case, an interlocutory decree of divorce had been entered on August 20, 1956—some four months prior to the birth of plaintiff. We cannot accept plaintiff's contention. To do so would be to rewrite, and not interpret, the statute. ▮ The purpose of the interlocutory system in California is to promote a reconciliation between the parties during the cooling-off period thereby imposed. ▮ Since one reason for requiring the wife's consent is to protect her against an unwanted daily reminder of her husband's unfaithfulness, the accomplishment of a legitimation of his illegitimate child might well act as a deterrence to any such reconciliation. In addition, the provision for her consent has other purposes, chiefly relating to the effect of legitimation on the economic rights of the wife. While an interlocutory decree of divorce may affect those rights, it does not terminate them, and the wife, although separated by decree of court, still has a concern in the creation of a new heir.

Plaintiff's attorney, appreciating the problem with which he was faced, realized that if the record could be changed to show that defendant was a single man after August 21, 1957, the minor child's cause of action for legitimation would be made that much easier. To accomplish this, plaintiff made a motion pursuant to section 133 of the Civil Code[1] requesting

---

[1]Section 133 of the Civil Code reads as follows: ''Whenever either of the parties in a divorce action is, under the law, entitled to a final judgment, but by mistake, negligence or inadvertence the same has not been signed, filed and entered, if no appeal has been taken from the interlocutory judgment or motion made for a new trial to annul or set aside the judgment or for relief under Chapter 8, Title 6 of Part 2 of the Code of Civil Procedure, the court, on the motion of either party thereto or upon its own motion, may cause a final judgment to be signed, dated, filed and entered therein granting the divorce as of the date when the same could have been given or made by the court if applied for. The court may cause such final judgment to be signed, dated, filed and entered nunc pro tunc as aforesaid, even though a final judgment may have been previously entered where by mistake, negligence or inadvertence the same has not been signed, filed or entered as soon as it could have been entered under the law if applied for. Upon the filing of

the court *on its own motion* to have defendant's final judgment of divorce entered *nunc pro tunc* as of August 21, 1957, the day defendant was legally entitled to have the same entered. Upon plaintiff's motion being granted, defendant immediately prosecuted an appeal (number 27182) from the order granting the *nunc pro tunc* final judgment of divorce and from the final judgment of divorce itself.[2]

Defendant has attacked the court's action, in this regard, on numerous grounds, to wit: (1) The delay in having the final judgment entered on the earliest possible date was not due to any "mistake, negligence or inadvertence"; (2) plaintiff was not a party to his divorce action nor was plaintiff in privity with either party in said action so as to come within the express provisions of section 133; and (3) the order sought and granted does not come within the purpose or intent of section 133. As will be shown hereinafter none of these contentions has merit.

Defendant, in resisting the application to have the final decree of divorce entered *nunc pro tunc* as of August 21, 1957, attempted to show that the delay in entering the judgment was not due to any mistake, negligence or inadvertence, but was due to his failure to pay the balance of a fee to his attorney who would not continue with the case until such balance was paid. However, the record shows that defendant thought that the final decree of divorce became automatic one year from the date of the interlocutory decree. Furthermore, as of August 21, 1957, defendant was not even aware that he owed his attorney any more money than had already been paid; that he had ample funds with which to pay the balance of the fee owing, and upon being notified by

such final judgment, the parties to such action shall be deemed to have been restored to the status of single persons as of the date affixed to such judgment, and any marriage of either of such parties subsequent to one year after the granting of the interlocutory judgment as shown by the minutes of the court, and after the final judgment could have been entered under the law if applied for, shall be valid for all purposes as of the date affixed to such final judgment, upon the filing thereof.''

[2]It is interesting to note, however, that because defendant appealed from the *nunc pro tunc* entry, the court, relying on *Naftzger* v. *Gregg* (1893) 99 Cal. 83 [33 P. 757, 37 Am.St.Rep. 23], refused to consider the predated decree in deciding the issue of legitimation. As will be hereinafter pointed out, no error occurred upon the court's entry of the final judgment of divorce *nunc pro tunc*, and the effective date after which defendant, under the facts here presented, could have legitimated plaintiff was August 21, 1957.

his attorney that a balance was still due, it was immediately paid.

It has been held that inadvertence and negligence may consist of a lack of heedfulness or attentiveness by refraining from doing the proper thing, and by failing to act when action is required. (*Berry* v. *Berry* (1956) 140 Cal.App.2d 50 [294 P.2d 757]; *Hull* v. *Hull* (1951) 102 Cal.App.2d 382 [227 P.2d 546].) Likewise, delay in the entry of the final judgment of divorce beyond the time when such judgment could have been obtained is a sufficient basis for finding inadvertence and negligence when the party entitled to such final judgment had no valid reason for such delay. (*Overby* v. *Overby* (1957) 154 Cal.App.2d 813 [317 P.2d 91]; *Hamrick* v. *Hamrick* (1953) 119 Cal.App.2d 839 [260 P.2d 188].) Upon the foregoing evidence and the prevailing law, the trial court was well justified in finding that the final decree of divorce was not entered as soon as it could have been, due to defendant's mistake, negligence and inadvertence.

■ Directing our attention to defendant's second point, it is well settled that a court may cause a final judgment in a divorce proceeding to be signed, dated, filed and entered *nunc pro tunc* even though a final judgment may already have been entered where, by mistake, negligence or inadvertence, the same has not been signed, filed or entered as soon as it could have been under the law if applied for (Civ. Code, § 133; *Overby* v. *Overby, supra* (1957) 154 Cal.App.2d 813; *Armstrong* v. *Armstrong* (1948) 85 Cal.App.2d 482 [193 P.2d 495]; *Macedo* v. *Macedo* (1938) 29 Cal.App.2d 387 [84 P.2d 552]). ■ And it is now well settled that, since the statute authorizes the entry *nunc pro tunc* on the court's own motion, application for such action may be made by a person not a party to the divorce action (*Hamrick* v. *Hamrick, supra* (1953) 119 Cal.App.2d 839; *Armstrong* v. *Armstrong, supra* (1948) 85 Cal.App.2d 482; *Estate of Hughes* (1947) 80 Cal.App.2d 550 [182 P.2d 253]) even in cases where the parties to the divorce proceeding are still alive. (*Hull* v. *Hull, supra* (1951) 102 Cal.App.2d 382.)

■ Appellant's third objection is equally unsound. Although entry of a final decree of divorce *nunc pro tunc* usually has as its purpose the validation of a marriage which would otherwise be bigamous, the Supreme Court of this state, referring to that fact, recently stated: "While the foregoing unquestionably states a most obvious purpose of the

868

statute we are not prepared to hold that the statute serves no other purpose than to validate a later marriage.'' (*Adoption of Graham* (1962) 58 Cal.2d 899, 904 [27 Cal.Rptr. 163, 377 P.2d 275].) ▉ In reality the purpose of a *nunc pro tunc* order is to avoid injustice to a person whose rights are threatened by a delay which is not his fault. (*Phillips* v. *Phillips* (1953) 41 Cal.2d 869 [264 P.2d 926]; *Norton* v. *City of Pomona* (1935) 5 Cal.2d 54 [53 P.2d 952]; *Estate of Pillsbury* (1917) 175 Cal. 454 [166 P. 11, 3 A.L.R. 1396].)
▉ Since the public policy of California is strongly in favor of legitimation (*Estate of Lund* (1945) 26 Cal.2d 472 [159 P.2d 643, 162 A.L.R. 606]), no good reason comes to mind why plaintiff, under the prevailing law, heretofore discussed, could not make use of a *nunc pro tunc* order in an attempt to establish his legitimacy, and we so hold.
▉ The evidence clearly shows that plaintiff, his mother and defendant lived together as a family in the Ambassador Hotel in Los Angeles during the latter part of August and the first part of September, 1957. This evidence adequately supports the trial court's finding that defendant ''adopted'' plaintiff within the letter of section 230 of the Civil Code.
▉ Since, as we have hereinabove pointed out in footnote number 2, the trial court properly refused to consider the appealed *nunc pro tunc* judgment, and since we are normally restricted to the evidence before the trial court, it would ordinarily follow that the case should be remanded so that that judgment, now affirmed, might be received in evidence. However, the court expressly found that all of the requisites of section 230, other than the consent of the former wife, had been met during a period which includes August 21 to September 26. Since we now hold that there was no ''wife'' in that period, it follows that the trial court, on a remand could only enter the same judgment as the one before us. Under these circumstances, remand would be a useless formality and we affirm this portion of the judgment as entered.
▉ In any event, the evidence is also sufficient to support a finding that defendant had ''adopted'' (i.e., legitimated) plaintiff, within the requirements of section 230, by conduct between the date of September 27, 1957, and December 22, 1957.

In *Estate of Baird* (1924) 193 Cal. 225, 279 [223 P. 974], the court stated: ''It is plain from the authorities in this state that so far as the element of receipt into the family is

concerned, the father, in order to comply with section 230, must have a home or habitation into which he shall receive his illegitimate child as his own, and that the place where he lives must be his settled or fixed habitation of which he is the head. It has been held that ... where the father and mother of an illegitimate child live in a home or habitation of which the former is the head, although they are not married, the father has a 'family' within the meaning of section 230, into which the illegitimate child may be received. [Citations.] ''

The issue now before this court is whether or not defendant, between the period of September 27, 1957, and December 22, 1957, had a ''home'' or ''family'' into which he received the plaintiff so as to satisfy the requirements of section 230. We think it proper, for a better understanding of the issue, to also consider events immediately prior to September 27, 1957.

It appears that defendant was contemplating marrying plaintiff's mother. However, there was some question as to the validity of a Mexican divorce theretofore procured by her. To resolve any doubt as to the validity of the divorce, defendant, on September 7, 1957, sent plaintiff and his mother to Reno, Nevada, so that plaintiff's mother could procure an American divorce. Plaintiff and his mother stayed at a hotel for six weeks so that the residence requirements for a Nevada divorce could be fulfilled. During part of this six-week period defendant remained in Los Angeles, but did, on three occasions, visit plaintiff and his mother for the week-end. During these Reno visits, defendant lived with plaintiff's mother as man and wife.

On October 15, 1957, defendant, in anticipation of the return to Los Angeles of plaintiff and his mother, rented an apartment in Hollywood ''for Mr. and Mrs. Paul Hurst and Paul Mark Hurst'' and paid the rent for eight weeks in advance. However, prior to the return of plaintiff and his mother to Los Angeles defendant had taken off on a trip and never had occasion to live in this apartment. This trip was allegedly for the purpose of his finding a home overseas, where all three could live. While defendant was away he made arrangements to have $75 a week sent to plaintiff's mother for their upkeep.

In recent years it has been the policy of the appellate courts of this state to give section 230 a liberal interpretation. A brief résumé of the more recent decisions pass-

ing on the problem of legitimation under section 230 will epitomize the courts' attitude in this regard.

In *Estate of Wilson* (1958) 164 Cal.App.2d 385, 387, 389 [330 P.2d 452], a married man fathered a child by someone not his wife. The child was occasionally in the father's home. The child's mother testified "that on one of such occasions the baby remained from about noon to dusk, slept on the couch and was played with by the [father] and his mother. An almost identical episode occurred about one year later. ... It is true that the [father] did not have much of a family life as we know such generally, but in the first instance, when the child was born, and the visitations were made to the [father's] home, the child was received with the consent of the then wife into [the father's] family."

In *Lavell* v. *Adoption Institute* (1960) 185 Cal.App.2d 557 [8 Cal.Rptr. 367], it was held that an *unborn* child was legitimized by its father by receipt into his family because the mother lived with the father. The mother left the father a few days before the child's birth and the father never lived with the child after its birth. The child was held to have been legitimated pursuant to section 230.

Finally, in *Estate of Peterson* (1963) 214 Cal.App.2d 258 [29 Cal.Rptr. 384], an adult female, married and with children of her own, was held to have been legitimated by her father, although the element of receipt into his family consisted of her meeting her father at his home in 1953 and making two additional weekend visits in 1955 and 1956.

In accord with the prevailing attitude to construe section 230 liberally, we believe that defendant's conduct between October 15, 1957, and December 22, 1957, amounted to a receipt of plaintiff into his family or home, and thus a legitimation of plaintiff. Defendant rented an apartment in Hollywood in the name of himself, plaintiff's mother and plaintiff. While it is true that he was never physically present there, he had no other "home" and, by his representation in registering for the apartment, he made it clear that plaintiff's mother was to be regarded and treated as his wife, and plaintiff as their child. Until December 22, 1957, he provided plaintiff's mother with money for their support. In the words of the trial judge, defendant "did everything that could be expected of one similarly situated, for several months after the final decree, to legitimate his son." We regard his conduct as establishing the apartment as his "home," and plaintiff and his mother as his "family."

We have examined the other contentions raised by defendant and find them to be without merit.

### APPEAL BY PLAINTIFF

Plaintiff's appeal involves the narrow issue of whether the trial court's award to plaintiff's attorneys of $10,000 for prosecuting the paternity action in the trial court was so inadequate as to amount to a clear abuse of discretion.

The case of *Berry* v. *Chaplin* (1946) 74 Cal.App.2d 669, 679 [169 P.2d 453], summarizes the major factors to be considered in determining what constitutes a reasonable compensation for an attorney, namely, "the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded [citation]; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed."

Plaintiff's attorney, Mr. Gustafson (of the firm of Gustafson, Thompson, Cohen & Ferguson) points to the fact that it is conceded by all parties and the trial court that this was a very difficult case, and above all plaintiff was successful in the action. Mr. Gustafson also calls to this court's attention that 277 hours were spent in preparation of this action as well as six days being spent in court on the trial of the action plus numerous other court appearances.

Mr. Edward W. Schramm, a Santa Barbara attorney of 25 years' experience, testified to Mr. Gustafson's training and ability as related to fixing attorney's fees. Mr. Schramm particularly noted that Mr. Gustafson started practice in the "early forties"; that he had a "distinguished career as a District Attorney in Ventura County"; that he "handled the trial of litigation in Ventura County that was unusual and important and the results achieved were outstanding"; that he is a Fellow of the American College of Trial Lawyers; that he was chairman of California Law Revision Commission; that he has "a reputation among the Bar of the State as being a scholar of substantial repute"; and that he knew Mr. Gustafson to be an attorney of great capability and qualifications.

Considering the difficulty of the case, especially in overcoming the previous stipulation, the results accomplished, the

nature and extent of the services rendered, the importance of the issues litigated, the financial position of the parties, and the years of experience, standing and qualifications of plaintiff's counsel, we hold that the award of $10,000 was wholly inadequate and an abuse of the discretion vested in the trial court.

In appeal No. 27182, the judgment and order are affirmed.

In appeal No. 27460 the judgment is affirmed in all respects except as to the award of attorney fees; as to the latter, it is reversed and the matter is remanded to the trial court for the sole purpose of redetermining the reasonable value of the services rendered and of entering judgment against defendant for the amount so determined. Plaintiff Paul Mark Hurst shall recover his costs on both appeals.

Burke, P. J., and Jefferson, J., concurred.

The petition of plaintiff and appellant in No. 27182 and defendant and appellant in No. 27460 for a rehearing was denied July 6, 1964, and his petition for a hearing by the Supreme Court was denied August 12, 1964.