[Civ. No. 31856.  Second Dist., Div. One.   Dec. 26, 1967.]

Estate of WILLIAM MARRIAN MAXEY, Deceased. BALDO M. KRISTOVICH, as Public Administrator, etc. et al., Petitioners and Appellants, v. HARRY LEE MAXEY, Petitioner and Respondent.

Harold W. Kennedy and John D. Maharg, County Counsel, Dixon M. Holston, Deputy County Counsel, and James S. Fitzpatrick for Petitioners and Appellants.

Jayme C. Billey, Jr., for Petitioner and Respondent.

WOOD, P. J.—In this proceeding in the Estate of William Marrian Maxey, deceased, three petitions were filed for an order appointing administrator—the petition of Baldo M. Kristovich, as public administrator; the petition of Lura Maxey Eissmann, as "widow" of the deceased; and the petition of Harry Lee Maxey, as the son of the deceased. Ivy Prock, Walter Maxey, Fonnie Maxey, Ruth Morrison, Sue Adams, and LaVern Hardaway, are brothers or sisters of the deceased. They reside in Oklahoma and were designated in the petitions of Lura and Harry as alleged heirs at law of the deceased. They did not file a contest or any papers in the proceedings, but an attorney appeared on their behalf at the hearing of the three petitions. The court made an order appointing Harry administrator and denying the petitions of the public administrator and Lura. The public administrator appeals from the order. Ivy Prock, Walter Maxey, Fonnie Maxey, Ruth Morrison, Sue Adams, and LaVern Hardaway

(brothers and sisters) also filed a notice of appeal.[1] (Lura did not appeal.)

Appellants contend that the evidence is insufficient to support the court's determination that Harry Lee Maxey is a legitimate child of the decedent (so as to be eligible for priority in the issuance of letters of administration under section 422 of the Probate Code).

Nettie Laverne (Hunt) Linville, called as a witness by petitioner Harry Lee Maxey, testified in substance as follows: She is the mother of Harry Lee Maxey. William Marrian Maxey, the decedent, who was also known as Bill Maxey, was the father of Harry. She met Bill Maxey in Red Oak (Latimer County), Oklahoma, in 1935, when she was 15 and he was 21 years of age, and they were living on adjoining farms. During 1935 she had sexual intercourse with Bill, and on June 26, 1936, she gave birth to Harry Lee Maxey. Her mother and Dr. Booth were present at the birth. (A certified copy of a birth certificate, which was registered in Latimer County, Oklahoma, and was received in evidence, states that Harry Lee Maxey was born on June 26, 1936, to Nettie Hunt, and that his father was Bill Maxey.) After Harry was born, she (Nettie, the mother) continued residing in Oklahoma approximately four years. She saw Bill Maxey "quite often" after the birth, and he asked her to marry him so that they "could bring up the boy." She married someone else, and they moved to Tracy, California. Thereafter, Bill Maxey (who then apparently resided in Oakland, California) came to her house in Tracy about once every six months and visited her, but he had not visited her in the past ten years. He talked to her about Harry, and once, when Harry was about 11 years old, he (Bill) asked her whether he might take Harry "over

---

[1]The brothers and sisters did not file a contest or any papers in the trial court, and the findings and order do not state that any appearance was made on their behalf; however, the reporter's transcript shows that an attorney appeared at the hearing of the three petitions and made objections, argued, etc., on behalf of the brothers and sisters. It has been held that persons who do not appear as parties in a probate proceeding (even though they appear as amici curiae) cannot appeal from an order or judgment therein. (*Estate of Thomas,* 74 Cal.App.2d 389 [168 P.2d 773]; but cf. *Estate of Sloan,* 222 Cal.App.2d 283 [35 Cal.Rptr. 167].) It has also been said that a person who does not appear as a party may not appeal even though he may be "aggrieved" by the order or judgment. (See 3 Witkin, Cal. Procedure (1954) Appeal, § 34, pp. 2180-2181.) In the present case the brothers and sisters did not appear as parties, but they are designated in two of the petitions as alleged heirs, and an attorney appeared on their behalf at the hearing of the petitions. In their brief on appeal they assert that the public administrator should have been appointed.

the summer vacation." When she replied that he would not be permitted to take Harry, Bill said: "Since he is my son I might as well have him. I might as well have him part of the time." When they had that conversation, her husband was present.

Mrs. Arrie Hunt, called as a witness by Harry, testified in substance that she is the mother of Nettie (Hunt) Linville and is the grandmother of Harry. She and Dr. Booth were present when Harry was born. When Nettie became pregnant, she (Mrs. Hunt) went to see Bill's father, Arthur, and told him that "since his son was of the age he was, that he would have to do something about it." Later, she "swore out a warrant" to have Bill "picked up." Immediately prior to the birth, she sent one of her sons to Bill's father for the purpose of getting a doctor.

Harry Lee Maxey testified in substance that he was born in Red Oak, Oklahoma, on June 26, 1936; while he was in grade school, Mr. William Maxey on numerous occasions came to the house where he (Harry) lived with his mother and stepfather; they had conversations, and Mr. Maxey asked him how he was getting along in school, what school he was attending, and "so on"; on one occasion Mr. William Maxey invited him, in the presence of his mother, to visit his (Mr. Maxey's) home and spend the summer there; on another occasion (time not stated) he visited his father at his father's apartment in Oakland; and on that occasion his father, in the presence of Jess Linville, addressed Harry as "son" numerous times.

The reporter's transcript does not include the testimony of any witness other than Nettie Laverne Linville, Arrie Hunt, and Harry Lee Maxey. Apparently Lura Maxey Eissmann (former wife of William Maxey) testified in support of her petition, but her testimony is not included in the record. Apparently no witness was called in opposition to Harry's petition or in support of the public administrator's petition.

Some of the findings were in substance as follows: An interlocutory judgment of divorce was entered in Alameda County on February 14, 1951, in an action between Lura Maxey and William M. Maxey, whereby Lura obtained a divorce from William. On January 31, 1966, a final judgment of divorce in said action was entered nunc pro tunc as of February 15, 1952. After the entry of the interlocutory judgment, Lura Maxey married Mr. Eissmann. Harry Lee Maxey was born on June 29, 1936, in Latimer County, Oklahoma. Nettie Hunt

(Linville) is the mother of Harry. The birth of Harry is registered in Oklahoma. Bill Maxey was named by Nettie Hunt as the father of Harry on the certified copy of the birth record of the Department of Health for the State of Oklahoma. Bill Maxey is the same person as William Marrian Maxey, the decedent. Nettie Hunt had intimate sexual relations with William Marrian Maxey, and with no other person, beginning early in 1935 and continuing thereafter until shortly before the birth of Harry. Harry was subsequently born to Nettie. Subsequent to the birth, Nettie and Harry became California residents, and William (decedent) became a California resident. On numerous occasions William visited the home of Nettie and Harry. On at least one occasion at said home, in the presence of others, William stated that Harry was his son. On at least one occasion, in the presence of others, William requested that Harry be permitted to spend the summer with him. On at least one occasion, Harry visited William at William's home in Oakland. On that occasion, and in the presence of others, William addressed Harry as his son.

Some conclusions of law are in substance that Lura Maxey Eissmann is not the surviving spouse of the decedent, and she is not entitled to letters of administration under section 422 of the Probate Code; Harry Lee Maxey is the son of William Marrian Maxey; William publicly acknowledged Harry to be his son and received him as such within the meaning of section 230 of the Civil Code; Harry is entitled to letters of administration pursuant to section 422 of the Probate Code; and Harry has priority over Lura and over the public administrator in accordance with the provisions of section 422 of said code.

Appellants contend that the evidence is insufficient to support the court's determination that Harry is a legitimate child of the decedent (so as to qualify Harry as a person entitled to letters of administration under section 422 of the Probate Code).

Section 422 of the Probate Code provides in part as follows: ''Administration of the estate of a person dying intestate must be granted to one or more of the following persons, who are entitled to letters in the following order, the relatives of the decedent being entitled to priority only when they are entitled to succeed to the estate or some portion thereof: (1) The surviving spouse . . . . (2) The children.

. . . (5) The brothers and sisters.[2] . . . (8) The public administrator. . . .'' It has been held that the words in said section which limit the relatives' priorities to persons entitled to succeed to the estate mean that ''only those relatives who take some share of the estate by operation of law, by descent, or by succession, are entitled to priority as administrators. . . .'' (*Estate of Stickelbaut*, 54 Cal.2d 390 [6 Cal.Rptr. 7, 353 P.2d 719]; see 4 Witkin, Summary of Cal. Law (1960) Wills and Probate, § 197, p. 3186.) ▮ It has also been held that section 230 of the Civil Code and section 255 of the Probate Code provide alternate methods by which a person born illegitimate may become the heir of his father (*Estate of Garcia*, 34 Cal.2d 419 [210 P.2d 841]); and that where there is evidence in support of a finding that a child has been acknowledged by the decedent in the manner required by section 230, it is unnecessary to determine whether there is support for a finding that the child was acknowledged in the manner required by section 255. (*Estate of Peterson*, 214 Cal.App.2d 258, 265 [29 Cal.Rptr. 384].) ▮ It has also been said that ''The trend of legislation governing the rights of persons born illegitimate is to give them the same status as those born legitimate.'' (*Estate of Garcia, supra*, p. 422; see *Estate of Lund*, 26 Cal.2d 472, 479-482 [159 P.2d 643, 162 A.L.R. 606]; 8 Cal.Jur.2d, Bastards, § 7, p. 221); and that section 230 ''is entitled to a liberal construction'' (*Estate of Wilson*, 164 Cal.App.2d 385, 388 [330 P.2d 452]; see *Estate of Lund, supra*, p. 488; *Hurst v. Hurst*, 227 Cal.App.2d 859, 869-870 [39 Cal.Rptr. 162].)

▮ In the present case, it is not contended that Harry was not the son of William (cf. *Estate of Wilson, supra*, p. 386). Appellants' contention is that the evidence does not support the finding that William acknowledged and received Harry as his son within the meaning of section 230 of the Civil Code.

Section 230 provides as follows: ''The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth.

---

[2] In the present case, the brothers and sisters have not sought the issuance of letters of administration to themselves or any of them. They are nonresidents, and they seek the issuance of letters to the public administrator.

The foregoing provisions of this chapter [procedures for formal adoptions] do not apply to such an adoption.''

In the present case, there was evidence and findings to the effect that Harry was the son of William; William on many occasions visited the house where Harry lived with his mother and stepfather; on some of those visits, William spoke to Harry about Harry's school attendance, and general welfare; on one of those visits William, in the presence of other persons, asked for permission to take Harry to his (William's) home for the summer, and, when that request was refused, William said that Harry was his son and that he should have Harry part of the time; and on another occasion, when Harry visited William at William's apartment, William addressed Harry as his son in the presence of other persons. The evidence supports the findings that William publicly acknowledged Harry as his son and that William received him as his son.

Appellant asserts, however, that there is no evidence that William's wife consented to William's acknowledgment and receiving of Harry as his son. Regarding the occasion when William requested that Harry spend the summer at William's home, the record is not clear as to whether William's wife consented to William's request. Harry's mother (Nettie) testified that Harry was 10 or 11 years of age, and was in grade school, when the request was made. On cross-examination, Nettie testified that William was married to Lura Maxey (later Mrs. Eissmann) at that time (about 1946 or 1947); and that she did not ascertain whether Lura Maxey would consent to William's taking Harry, because Lura (Mrs. Eissmann) ''was working at the time.'' (No witness was called in opposition to Harry's petition, and Mrs. Eissmann's testimony has not been included in the record on appeal.) With reference to the occasion when Harry visited William's apartment, Harry testified that he spent the ''whole day'' there, and that William frequently addressed him as son in the presence of himself and Jess Linville. That visit apparently occurred after William and Lura had been divorced.[3] The record does not show the date of that visit, and there is no evidence or finding that William was married at that time. ■ Whether William legitimated Harry in the manner required by section 230

---

[3] Their final judgment of divorce was entered *nunc pro tunc* as of 1952, at which time Harry was 16 years of age. There was a finding that, after entry of the interlocutory decree, Lura Maxey married ''a third party stranger to this action'' (Mr. Eissmann).

presented a question of fact for the trial court. (*Guardianship of Truschke*, 237 Cal.App.2d 75, 78 [46 Cal.Rptr. 601]; see *Estate of Abate*, 166 Cal.App.2d 282, 289 [333 P.2d 200].) The evidence supports the court's determination that "William publicly acknowledged Harry to be his son and received him as such within the meaning of section 230 of the Civil Code."

The facts herein are distinguishable from those in *Estate of Pico*, 52 Cal. 84, wherein it was held that an illegitimate child was not entitled to letters of administration as against a brother of the child's father. In *Pico*, some of the conduct of the father with reference to acknowledging and receiving his son occurred prior to the enactment of section 230 of the Civil Code, and the court held that the provisions of section 230 were not retroactive. The court also held that the provisions of section 230 apply only to minor children.[4] In the present case there is no evidence that Harry was an adult when William acknowledged and received him. In any event, the Supreme Court has overruled the *Pico* case and held that the provisions of section 230 are applicable to adult children. (*Estate of Lund, supra,* pp. 491-493; see *Estate of Peterson, supra,* 214 Cal.App.2d 258, 263, wherein it was held that a daughter who first saw her father when she was 34 years of age, and who thereafter visited her father on three occasions, was legitimated by her father within the meaning of the provisions of section 230.)

The order (appointing Harry Lee Maxey administrator and denying the petition of the public administrator and Lura Maxey Eissmann) is affirmed.

Fourt, J., and Lillie, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 21, 1968.

---

[4]In *Pico*, the court held that the provisions of section 230 were inapplicable and applied the common law, which disfavored the rights of illegitimate children, to deny letters to the child. Recently, the Supreme Court has said (*Estate of Lund, supra,* p. 481): "It cannot be seriously disputed that the public policy of California disavows the common-law tenets and favors legitimation." (See *Estate of Wilson, supra,* p. 388.)